# In the United States Court of Federal Claims

**No. 19-1892C**
**Filed: November 30, 2021**

```
* * * * * * * * * * * * * * * * * *
```
|  |  |
|---|---|
| | * |
| **BES DESIGN/BUILD, LLC,** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| | * |

```
* * * * * * * * * * * * * * * * * *
```

**Todd A. Jones,** Anderson Jones, PLLC, Raleigh, NC for plaintiff. With him was **Edward P. Kendall**, Strickland & Kendall LLC, Montgomery, AL.

**Ioana Cristei**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her was **Kelly A. Krystyniak**, Trial Attorney, Commercial Litigation Branch, **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch; **Brian M. Boynton**, Acting Assistant Attorney General, Civil Division. **Major Nicole Kim**, Judge Advocate, United States Army, of counsel.

# O P I N I O N

## HORN, J.

In the above captioned case, plaintiff, BES Design/Build, LLC (BES Design/Build), filed a complaint in this court, albeit one labeled "Notice of Appeal," which stated it was a "Notice of Appeal to the United States Court of Federal Claims from the Contracting Officer's Final Decision ('COFD'), which was issued on BESDB's [BES Design/Build] claim on Contract Task Order W911S2-16-D-800-0001 on December 13, 2018." In this court, plaintiff subsequently filed an amended complaint, a second amended complaint, and, finally, its third amended complaint. The third amended complaint, filed on September 4, 2020, asserts two counts: Count One, "Breach of Contract – Failure to Pay," on the grounds that the government "breached its obligations under the Contract and failed to satisfy its obligations under FAR 52.232-10 by not compensating Plaintiff for the total value of work completed and accepted," and Count Two, "Changes," for "various changes to the Plaintiff's scope of work under the Contract" such as "Government directives to alter the design to include underground electrical utilities, an outside fiber

optic cable and the inclusion of existing utility duct bank profiles." (capitalization in original). After an extended discovery process, the parties filed cross-motions for partial summary judgment, only on Count Two of the third amended complaint. The decision on Count Two has proven to be challenging in part due to the minimalistic approach of the parties' submissions in varying degrees on different issues. After extensive review of the record, the applicable statutes, regulations, contract provisions, and other referenced documents, the court issues the following decision.[1]

# F I N D I N G S   O F   F A C T

On December 1, 2015, BES Design/Build and the United States Army entered into contract number W911S2-16-D-8000 (the contract), "an Indefinite Delivery Indefinite Quantity (IDIQ) contract for Architect & Engineering Services for use on federal projects located primarily at Fort Drum, [New York], but may be used on other federal projects as requested.. [sic]" The contract included a ceiling price of $4,500,000.00. The contract was scheduled to last "for a period of three years through November 30, 2018," and provided that "[t]here are no option periods." The contract stated that "[w]ork will be provided on a Task Order basis as the Government's needs arise." The contract also included a statement of work (SOW) that provided general requirements for the performance of the contract and any task orders, including requirements for the submission of required deliverables. According to defendant's motion for partial summary judgment, "[t]he contract included firm fixed-price fully burdened negotiated labor rates for each labor category BESDB would use in performing each task order." Further, according to defendant, task orders under the contract were "to be issued on a firm fixed-price bases, with the price to be negotiated based on the negotiated labor rates."

On December 2, 2015, the day after the contract was awarded to BES Design/Build, "the Army issued task order number W911S2-16-D-8000-0001 (task order)," which contained one item, the "Minimum Order Guarantee," priced at $10,000.00. Subsequently, on December 18, 2015, then-Contracting Officer Cindy McAleese issued to plaintiff a "Request for Task Order Proposal for A&E [Architect & Engineering] Design & SWPPP [Stormwater Pollution Prevention Plan] for 400 Area Improvements," included in the record as an attachment to plaintiff's October 17, 2017 request for equitable adjustment (REA). (capitalization in original). The Request for Task Order Proposal (RTOP) provided:

> The Contractor shall furnish all labor, management, facilities, supplies, equipment, and material necessary to perform an A&E Design & SWPPP for the 400 Area Improvements, with a 100% design completion date of 130 Calendar days after task order award. <u>All work performed under this task order shall be in accordance with the attached Performance Work Statement</u>.

(emphasis added). The RTOP further provided that "[t]he Task Order Proposal shall be due on 30 December 2015," and stated that the "[l]imit for construction cost for this task order is $4,500,000.00, and a 6% maximum design fee of $270,000.00." Attached to the

---

[1] The court includes extensive quotation from the above sources to give context for this Opinion as well as for the parties as the case proceeds.

RTOP was the Fort Drum Performance Work Statement (PWS),[2] which would provide the specific requirements of the "400 Area Improvements" project task order.

According to a "Memorandum for Record" prepared by Ms. McAleese, dated February 2, 2016, and included in defendant's appendix to its motion for partial summary judgment, following the issuance of the RTOP,

> BES Design/Build submitted an original cost proposal on 7 January 2016 in the amount of $421,953.33. Negotiations were entered into on 13 January 2016, and the Government took exception to two main areas in their proposal. First, the profit percentages for BES Design, the prime firm, and KCI, one of their approved consultants, were incorrectly stated at 12%. The proposed rates for both firms were only 10% in the master contract, so they agreed to make the appropriate revisions. Second, they had estimated total construction cost to be $4,500,000.00 in their proposal, and it should've been only $4,000,000.00. They agree with the error and agreed to change it in their proposal, and revise their design fees accordingly.

The Memorandum for Record further stated that "[o]n 14 January 2016, BES Design/Build submitted a revised fee proposal in the amount of $370,184.41. PWE reviewed the revised fee proposal and accepted it on 15 January 2016."

Modification W911S2-16-D-8000-0001-01 (modification)[3] to the task order was issued on February 11, 2016, which placed an order for "all supervision, plant, labor, material and equipment necessary to perform all operations in connection with the A&E Design and SWPPP for the development of the 400 Area, Fort Drum NY, in accordance with the attached Performance Work Statement," and set the negotiated firm fixed price of the task order at $370,184.74, based on the Estimated Cost of Construction (ECC) of $4,000,000.00.[4] The task order proposal was negotiated by the government and contractor, and while the proposal itself is not in the record, the record does not indicate that utilities were part of the negotiation. The modification reflected the agreement reached by negotiation between the government and plaintiff regarding the task order proposal and accepted by the government on January 15, 2016. As with the RTOP,

---

[2] The first time the PWS was attached to any contract document was when it was attached to the RTOP.

[3] The modification issued on February 11, 2016 is the first modification to the task order. A second modification, modification W911S2-16-D-8000-001-02, was subsequently issued on April 24, 2017 and extended the period of performance on the contract to September 30, 2017. The second modification is not relevant to the pending cross-motions for partial summary judgment regarding Count Two of the third amended complaint.

[4] According to the February 2, 2016 Memorandum for Record, plaintiff had originally provided for an "estimated total construction cost" of $4,500,000.00, but plaintiff reduced this figure to $4,000,000.00 in negotiations with the Army.

described above, attached to the modification was the PWS, the second attachment of the PWS to a contract document.

The modification set firm fixed prices for each design milestone, and "[t]he fees for the design requirements alone (the 35%, 65%, 95%, and 100% milestones) equaled to $239,944.56, or approximately 6% of the $4 million estimated cost of construction." The firm fixed prices for the milestones were as follows:

| SUMMARY | Total Price |
|---|---|
| 1. Field Investigation (Non-Design) | $113,881.66 |
| 2. Design – 35% | $61,285.31 |
| 3. Design – 65% | $77,717.05 |
| 4. Design – 95% | $65,181.55 |
| 5. Design – 100% | $35,760.65 |
| 6. RFI & Bidding | $16,358.18 |
| 6. [sic] Construction Services | $ - [5] |
| Totals | $370,184.41[6] |

(capitalization and emphasis in original).

Two of the contract documents, specifically the SOW and the PWS, reference an additional document, the Fort Drum Installation Design Guide (IDG). The SOW provided that "[a]rchitectural themes will be in accordance with Fort Drum's Installation Design Guide (IDG), latest edition."[7] The PWS, attached to the December 18, 2015 RTOP and the February 11, 2016 modification, similarly provided that "[t]he contractor shall provide and develop site design and landscaping for 400 project area, which comply with the Ft drum installation design guidelines requirements . . . ." (capitalization in original). As discussed further below, although the terms "Ft drum installation design guidelines" and "Fort Drum's Installation Design Guide" are not identical they appear to refer to the same document, and these references raise the question of whether the IDG was incorporated into the contract. According to defendant's reply in support of its motion for partial summary judgment, the IDG "'provides design guidance' for all site planning, buildings, circulation, landscaping, site elements, and force protection at Fort Drum." Whether the IDG's requirements were incorporated into the contractual agreement between the plaintiff and the Army, and if so, whether the IDG or other documents which were incorporated into the contract between the parties for architectural and engineering services required that electrical utilities be placed underground is a main focus of the

---

[5] The price for the "Construction Services" milestone is blank in the PWS.

[6] The total of the milestones should equal $370,184.40, not $370,184.41 as listed in the modification.

[7] The edition of the IDG included in the record before the court is dated April 2011.

dispute addressed in this Opinion. Additionally, the parties have offered arguments regarding whether the government's actions during the course of performance of the contract constituted changes to the contract between the parties, whether plaintiff gave proper notice of such alleged changes, and whether any of the alleged changes to the contract were affirmed by the government.

It is unclear from the record before the court when or how the Army provided the IDG to plaintiff. Defendant, in its response to plaintiff's motion for partial summary judgment, states only that "[t]he Army also provided BESDB with the Fort Drum Installation Design Guide," without providing further detail. Plaintiff's reply in support of its own motion for partial summary judgment similarly states the IDG was "prepared or drafted by the Government" without explaining further. The IDG was not included in the record before the court until it was submitted as a supplemental appendix to defendant's response to plaintiff's motion for partial summary judgment. According to the deposition of Mr. Ward, the Assistant Project Manager of BES Design/Build, conducted by defendant and included in plaintiff's appendix, the IDG "was included in the initial contract documents," and when Mr. Ward was asked if he was "familiar with the Installation Design Guide," he answered: "Yes."

Following the issuance of the modification, the contract between the Army and BES Design/Build contained the contract SOW, the task order, the modification, the PWS, and IDG. As stated above, the PWS was attached to the RTOP and to the February 11, 2016 modification, which both directed that the contractor perform the task order "in accordance with the attached Performance Work Statement." The IDG, as stated above and as further discussed below, was incorporated into the contract and the task order by statements included in the contract and the PWS.

The contract established the framework pursuant to which task orders would be issued to plaintiff. As noted above, he contract included one item, "A & E Services – General Design," which included the following description: "Services to be provided in accordance with the scope of work provided for herein and any associated task orders." With respect to task orders, the contract provided: "Work will be provided on a Task Order basis as the Government's needs arise. The Task Orders will be Firm Fixed Price."[8] (capitalization in original).

The contract further provided:

Only a Warranted Contracting Officer, acting within their delegated limits, has the authority to make modifications or otherwise change the terms and conditions of this contract. If an individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract you shall not proceed with the change and shall immediately notify the Contracting Officer.

---

[8] According to the record currently before the court, only one task order, W911S2-16-D-8000-0001, the task order at issue in the case currently before the court, was issued under the contract.

The parties have distinctly different understandings of what the terms of the contract are and of the impact of the clauses of the Federal Acquisition Regulation (FAR) and of the Defense Federal Acquisition Regulation System (DFARS), which were incorporated into the contract, as well as which clauses were relevant to contract performance. The contract incorporated the text of a number of FAR clauses, including FAR 52.216-18, "Ordering (Oct 1995)," FAR 52.236-22, "Design Within Funding Limitations (Apr 1984)," FAR 52.236-23, "Responsibility of the Architect-Engineer Contractor (Apr 1984)," FAR 52.236-24, "Work Oversight in Architect-Engineer Contracts (Apr 1984)," and FAR 52.246-4, "Inspection of Services – Fixed-Price (Aug 1996)."

The contract incorporated additional FAR clauses by reference, including FAR 52.243-1, "Changes – Fixed Price (Aug 1987) – Alternate III," FAR 52.243-7, "Notification Of Changes (Apr 1984)," and FAR 52.233-1, "Disputes (May 2014)." The contract additionally incorporated DFARS 252.216-7006, "Ordering (May 2011)." In accordance with 10 U.S.C. § 4540 (2012),[9] the contract also was subject to DFARS 236.606-70, "Statutory fee limitation." The parties agree that DFARS 236.606-70 applies to this contract, although they express its application in different terms. Plaintiff argues that "[t]he Contract incorporated DFARS 236.606-70," while defendant argues that "BESDB's contract is subject to DFARS clause 236.606-70 . . . ." Task orders were issued under the original contract and were "subject to the terms and conditions of the contract," such that "[i]n the event of a conflict," the terms and conditions of the contract would prevail over those of any task order. See FAR 52.216-18(b). In other words, any task order issued under the contract incorporated the terms and conditions of the contract.

As stated above, the contract included a "Statement of Work" (SOW). Unlike the later PWS, which was attached to the RTOP and to the modification and provided the technical requirements for the task order at issue in the case before the court, the contract SOW set requirements applicable to the performance of any task orders issued under the

---

[9] The court notes that 10 U.S.C. § 4540 was recodified at 10 U.S.C. § 7540 in the John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 808(c)(2), 132 Stat. 1636, 1839 (2018). Therefore, the reference to 10 U.S.C. § 4540 in DFARS 236.606-70(a) is out of date and should instead to 10 U.S.C. § 7540. The statute at 10 U.S.C. § 4540 (2012) provided in relevant part:

(a) Whenever he considers that it is advantageous to the national defense and that existing facilities of the Department of the Army are inadequate, the Secretary of the Army may, by contract or otherwise, employ the architectural or engineering services of any person outside that Department for producing and delivering designs, plans, drawings, and specifications needed for any public works or utilities project of the Department.

(b) The fee for any service under this section may not be more than 6 percent of the estimated cost, as determined by the Secretary, of the project to which it applies.

10 U.S.C. § 4540 (2012) (current version at 10 U.S.C. § 7540 (2018)).

contract, including instructions for how to prepare and submit deliverables in the course of performance. In particular, section "C.5 Deliverables" of the SOW contained specifications for the submission of percentage designs. Paragraph "C.5.1 Format and Media" of the SOW provided, in relevant part, that "Concept Design (35%), Interim Design (65%) and Final Progress Design (95%) and Final Design (100%) shall be submitted to the Government for review and comments." (capitalization in original). Section "C.5 Deliverables" of the SOW further provided:

C.5.4 Government Review and Comment: The Contractor shall prepare a review and comment form to be used. The format of the review and comment form shall be submitted to the Government for approval. The final format of the form shall be mutually agreeable to both the Contractor and Government. Upon approval of the form, the form shall not be modified unless approved by the Contracting Officer. The form shall be prepared in Microsoft Word. For each design phase submittal, the Government will, as it determines appropriate, distribute the design phase submittal to project stakeholders for review and comment. The Contractor shall consolidate all review comment forms into one master document where the Contractor shall respond directly to each specific Government review comment.

C.5.5 Concept Design (35%): The Concept Design (35%) shall primarily consist of project concepts, preliminary drawings, field investigation narrative reports indicating analysis of existing conditions, economic analysis, identification of permit requirements and proposed scheme of work. It shall include drawings and design analysis assuring compliance with Government criteria. It shall also include a tentative Table of Contents showing proposed specification sections to be used.

C.5.6 Interim Design (65%): The Interim Design (65%) is used to check progress, schedule, cost, and identify any risks to timely completion of the design. The Interim Design shall consist of drawings, redlined UFGS [Unified Facility Guide Specifications], prepared project specification drafts, updated design analysis, revised cost estimate, and draft design reports. Drawing, specifications, and design analysis will be updated by all comments and project development. The basis for changes will be documented.

C.5.7 Final Progress Design (95%): The 95% interim design shall be the Final Progress Design, and shall be complete in the final format and accurate in the best judgment of the Contractor, except for minor typographical errors and pencil-in corrections. This deliverable shall include a reproducible copy of the 65% design comments with responses.

C.5.8 Independent Technical Review: The Contractor shall have an independent technical review conducted (review by someone technically qualified from each discipline other than the designer/designer engineer(s))

of all drawings, specifications and other required technical documents prior to the final review. The intent of this independent review is to eliminate errors, interferences, and inconsistencies, and will be used to verify that all design criteria, review comments, guide specifications, and contract requirements are incorporated into the final design.

C.5.9 Final Design (100%): The Final Design (100%) represents the total design effort. The Contractor will incorporate the 90% review comments into the 100% submission. This submission shall consist of completed permits, drawings, specifications, submittal registry, cost estimate, design analysis, reports, and a reproducible copy of the 90% design comments. If it is determined by the Government that all necessary comments were not incorporated into the final submittal, the Contractor shall, at no additional cost to the Government, make immediate correction to the contract documents. If requested in the Task Order, final GIS deliverables shall be provided. The final design analysis shall be complete and support the requirements of the project. Final design drawings, specifications, cost estimate, and other deliverables shall have been thoroughly checked with all comments incorporated. Any required permit applications, permit approval letters, and/or any requirements that apply to project construction shall be included in appendices to the specifications. The Contractor shall submit with the final design a written certification that the Independent Technical Review was completed prior to submitting to the Government.

C.5.10 Final Back-Checked: A revised final submittal may be required to assure all comments have been satisfactorily resolved and the design documents are ready to be used for solicitation of construction proposals. The final contract documents shall contain the necessary details to permit prudent and competitive bids, and must be sufficient in technical quality, accuracy, and completeness to afford a clear understanding of the construction project.

(capitalization in original).

Section "C.8 Civil Engineering" of the SOW set out "requirements for site planning and layout: roads, railroads, parking areas, drainage, and/or other civil works," the contract required the contractor "[p]rior to beginning site development plans," to "obtain the following data," including the "[l]ocation of existing roads, utilities, buildings, and other features . . . ." Paragraph "C.8.6 Concept Design" of the SOW provided:

The Contractor will develop a conceptual site plan which encapsulates the project requirements. The plan should be an efficient layout with emphasis given to user requirements. The plan will show building locations, parking areas, roads, limits of paving and hardstands, and pedestrian access. The plan will be developed so that a preliminary cost estimate can be prepared.

The Concept Design was required to include information concerning a "[u]tility plan," as well as a "[l]ayout plan" containing "[c]enterline stationing for roads, streets, parking areas, runways, taxiways, utilities, and alignments."

Following the Concept Design, paragraph "C.8.8 Interim Design" of the SOW provided that "[t]he Contractor will advance from the concept into design. All components from the concept review will be resolved/incorporated into the interim design." (capitalization in original). At the interim design stage, the contract SOW required the submission of "Interim Design Drawings," including the following, in relevant part:

> ii. Removal and/or Relocation plans: Indicate all items of work that require removal or relocation.  Provide dimensions for removal items such as pavement, curbs, sidewalks, utilities, buildings, walls, partitions, or other site features proposed for removal or relocation.
>
> . . .
>
> v. Utility Plan: The utility plan will identify and locate water lines, sanitary sewers, natural gas, electrical, communications, and other subsurface utility features.
>
> . . .
>
> vii. Utility Profiles: Provide profiles for all storm drainage systems, sewer lines, water lines, and telecommunications duct banks. Indicate invert elevations, ground profiles and new and existing structures and utility crossings.

(capitalization in original). Following the Interim Design, the SOW required a "Final Design," at which stage "[t]he Contractor will advance the design to completion resolving/incorporating all comments from the previous design reviews. This design phase should only require minor editorial changes." (capitalization in original). As with the Interim Design, the SOW provided for the Final Design to be accompanied by "Final Design Drawings," with the following requirements:

> Revise previously prepared design drawings to resolve/incorporate all previous review comments. Add general notes to drawings as required; ensure correct cross-referencing among site drawings for appropriate deals, sections, match lines, and other methods for continuities of drawings; eliminate all conflicts (horizontal and vertical) among site plans, architectural plans, structural and utility plans.
>
> Section "C.10 Architectural" of the SOW provided:
>
> C.10.1 Purpose and Applicability: This section presents environmental requirements for preparing and presenting architectural designs. Excellence in architectural design is a primary goal for military construction projects on Fort Drum. Architectural themes will be in accordance with Fort

Drum's Installation Design Guide (IDG), latest edition. The Contractor will assure architectural compatibility with local environment, economy of construction, sustainability, energy conservation, functional requirements, and interior and exterior detailing.

(capitalization in original; emphasis added). The reference to the IDG in Paragraph C.10.1 is the first mention of the IDG in the contract documents currently in the record before the court.

Included in section "C.13 Electrical Engineering" of the SOW, paragraph "C.13.4 Concept Design" provided:

b. Drawings: For interior work, provide building floor and ceiling plans. Plans will include layouts for lighting, conduits, feeders, branch circuits, grounding, and electrical receptacles. For renovation and demolition projects, plans will depict the work and non-work requirements. Where work is extensive, separate sheets should be used to show existing-to-remain, demolition, and new work. For exterior work, provide exterior electrical supply and lighting plans. The electrical drawings will include plan and elevation drawings. Electrical supply and lighting layouts will show new and existing utilities. Plans will show locations of electrical supply equipment, building service equipment, and exterior supply circuits affected by the project. The plans will be coordinated with other utility plans concerning scale and landmark references for proximity and interference management. The plans will be separate from water, sewer, and other utility plans. Signal line diagrams will depict proposed power sources and distribution schemes (interior and exterior, as applicable). The diagrams will include existing and proposed protective device types in sufficient detail to communicate the system protection methods.

The SOW at paragraph "C.13.6 Final Design" further provided:

b. Drawings: Final drawings will show all pertinent plans, elevations, sections, details, schedules, and notes to present a complete description of the construction requirements. All elements will be properly annotated and located with proper dimensions.

(1) Exterior Electrical Drawings will include:
(i) Details which clearly depict the installation requirements of overhead and underground supply and utilization equipment;

(capitalization in original). Section "C.15 Miscellaneous" of the SOW provided:

C.15.1 Purpose and Applicability: The statements of work as outlined in Parts 1 through 19 shall not be construed to be inclusive of architectural and engineering design services that may be contemplated by the

Government for award of task orders under this contract. When design services requested in a project scope of work do not clearly fall within one of these parts, the design phase submittal requirements, as outlined in these parts, will apply to the requested design services. Discussion and clarification of project scopes shall be completed during the scope meeting attended by Government representatives and the contractor.

(capitalization in original). In the same section, the SOW included:

IMPORTANT NOTICE: *The Contractor will not accept any instructions issued by any person other than the Contracting Officer or his/her authorized representative acting within the limits of his/her authority. No information other than that which may be contained in any authorized amendment to this contract or any authorized modification to the contract issued by the Contracting Officer, which may be received from any person employed by the U.S. Government or otherwise, shall be considered as grounds for deviation from any provisions, conditions or other terms of this contract.*

(capitalization and emphasis in original). In the same section, the SOW continued:

C.15.5 Government Contracting Officers Representatives Their Authority: The Contracting Officer may identify the individuals to act as the Contracting Officer's Representative (COR) and the Alternate Contracting Officer's Representative (ACOR). This designation will be made in writing with a copy furnished to the contractor. <u>The COR staff will represent the Contracting Officer in the administration of the contract, but will not be authorized to change any of the terms and conditions of the contract</u>.

No oral statements of any person, whomsoever, will, in any manner or degree, modify or otherwise affect the terms and conditions of this contract. <u>The Contracting Officer shall be the ONLY person authorized to approve changes in any provisions contained elsewhere in this contract, and said authority shall remain solely with the Contracting Officer</u>.

(capitalization and italics in original; emphasis added).

The task order – which, as discussed above, effected a "Minimum Order Guarantee" in the amount of $10,000.00 – did not include separate, substantive terms and conditions. The task order provided that "[t]his delivery order/call is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract." The task order further provided: "The Contractor hereby accepts the offer represented by the numbered purchase order as it may previously have been or is now modified, subject to all of the terms and conditions set forth, and agrees to perform the same."

The RTOP, as noted above, was issued on December 18, 2015, and provided that while "[t]his solicitation does not commit the United States Government to award a task order," for any task order awarded in response to the contractor's task order proposal, "[a]ll work performed under this task order shall be in accordance with the attached Performance Work Statement." Following plaintiff's submission of its task order proposal, not included in the record before the court, and subsequent negotiations between the Army and plaintiff, the Army issued the modification to the task order at issue in the case currently before the court.

The modification was issued on February 11, 2016, on what looks like a task order form, but labeled "Delivery Order/Call No. 000101." In place of the Minimum Order Guarantee, the modification included an item "AE Design & SWPPP 400 Area Improvements," with a unit price of $370,184.71, and included the following description:

> Contractor shall provide all supervision, plant, labor, material and equipment necessary to perform all operations in connection with the A&E Design and SWPPP for the redevelopment of the 400 Area, Fort Drum NY, in accordance with the attached Performance Work Statement, specifications and drawings dated December 1, 2015, and subject to the terms and conditions of the contract. The final, 100% Design Plans, shall be due 130 calendar days from task order award.

(capitalization in original). The modification was additionally documented on February 11, 2016, on a form labeled "Amendment of Solicitation/Modification of Contract," (Modification of Contract form) and included in plaintiff's appendix to its motion for partial summary judgment, as "Amendment/Modification No. 01." The Modification of Contract form provided that "[t]he purpose of this modification is to add additional funding and definitize the task order with the attached Performance Work Statement dated 01 December 2015." The Modification of Contract form confirmed that "[t]he total cost of this contract was increased by $360,184.71 from $10,000.00 to $370,184.71," and reflected the replacement of the Minimum Order Guarantee item with the "AE Design & SWPPP 400 Area Improvements" item.

The modification incorporated the PWS which, unlike the contract SOW described above, set the specific requirements for performance of the task order at issue in the case currently before the court. The PWS was prepared by the "For Drum Public Works Engineering Division" and was labeled "PW [Public Works] Engineering Task Order Performance Work Statement/Statement of Objectives for A/E Design Services." Section "1.0 General" of the PWS provided:

> This Performance Work Statement/Statements of Objectives (PWS/SOO) to this task order. This PWS/SOO presents an overview of Government design requirements. The SOW describes design disciplines that the Government deems necessary to complete the project. The Architectural & Engineering (A/E) firm shall not consider these design disciplines to be

inclusive of all design requirements that would result in a complete and useable project design for acceptance by the Government. It shall be the A/E's responsibility to prepare a fully developed proposal to provide a complete and usable design acceptable to the Government.

## 1.1 Project Purpose and Description

The purpose of this project is to develop necessary engineering documentation including construction plans, field investigations, specifications, design calculations and analysis, SWPPP (Stormwater Pollution Prevention Plans) for construction activities and current working estimate to develop the 400 project area by providing asphalt paved parking lots, concrete paved sidewalks, pave inside service roads, mill/reconstruct the failing Lewis and Fourth Street West roads, improve the drainage to avoid any water ponding, provide utilities to accommodate the new design and layout, and landscaping within the 400 area (refer the Government provided preliminary concept plans in the appendices)

. . .

## 1.3 Project Design Objectives

The objectives for this A/E design project are: (1) provide construction level engineering design plans and specifications for PW Engineering to competitively solicit construction proposals using one or more IDIQ construction contracts (i.e., MATOC, JOC, and/or Requirements Contract) vehicles: (2) provide engineering design solutions to meet PW Engineering's customer's needs for a complete design: (3) Provide an engineering design solution that meets the customer needs within the cost limits of the Government's estimate for construction and as necessary prepare bid alternates to maintain the construction cost within cost limitations: (4) develop a detailed engineer's opinion of cost for construction consistent with the design. (5) respond to construction contractor Requests for Information (RFIs) generated during the bidding process: (6) prepare and issue design amendments for revised engineering designs, scopes, and cost estimates resulting from responses to contractor RFIs, as necessary and appropriate.

(capitalization in original).

In a section labeled "2.0 A/E Services," under the heading "2.1 General," the PWS provided that "[t]he Contractor will conduct a design charrette, scoping and planning

meeting. . . . A site visit(s) will be held during the design charrette."[10] (capitalization in original). With respect to the Design Charrette meeting, the PWS specified that "[t]he contractor will prepare a design charrette agenda and schedule for review and approval by the Contracting Officer. The design charrette shall address all aspects of the project requirements." (capitalization in original). The PWS further provided that "[t]he Contractor will prepare a design charrette report and preliminary plans and submit the same to the contracting officer." (capitalization in original).

Under the heading "2.2 Statement of Design," the PWS provided a number of technical requirements, specifically, the requirement that the contractor to perform a "Site Investigation," according to the following requirements:

> The contractor shall complete a site investigation to evaluate site conditions that will affect design and construction of the project. The site investigation shall include, but not limited to, subsurface soil conditions, grading, drainage, access and circulation, horizontal and vertical location of aboveground and underground utilities, and adjacent facilities and services in the immediate vicinity of the project site, and any other information required. Complete and instrument survey of the site and immediate surrounding area. The survey shall be prepared by, and bear the seal and signature of, a licensed land surveyor. The survey shall establish at least two temporary benchmarks for horizontal and vertical control for construction[.]

Paragraph "2.2.3 Site/Civil Design" of the PWS further provided:

> The contractor shall provide and develop site design and landscaping for 400 project area, which comply with the Ft drum installation design guidelines requirements, in compliance with ADA Accessibility Guidelines (ADAAG), meet the force protection standards as defined in IAW UFC 4-010-01, and improve the drainage to avoid any water ponding. A copy of UFC 4-010-01 is provided in Appendix B.

(capitalization in original). Paragraph 2.2.3's reference to "installation design guidelines" is the second reference to the IDG in the contract documents. Paragraph "2.2.8 Utilities" of the PWS provided:

> 2.2.8.3 Electrical
>
> > Any existing electrical primary and secondary services, transformers (that need to be removed, or abandoned or required to be upgraded), electrical poles, light fixtures and any others that need to be removed or abandoned or relocated need to be identified.

---

[10] The record currently before the court provides no additional information as to the nature of the Design Charrette meeting aside from the material quoted here.

> Provide primary and secondary electrical distribution services infrastructure, new lighting poles, transformers, LED light fixtures, parking lots lighting and streets lightings and other for the new layout and development of the 400 project area.

(capitalization in original).

Immediately following "2.2.8.3 Electrical," paragraph "2.2.8.4 Communications" provided: "The existing communications (above ground or underground) that need relocation are required to be relocated underground and new underground communication in the 400 project area shall be provided in accordance with Ft Drum Utility standards and I3A Technical Guide (latest)." (capitalization in original).

The PWS lists additional appendices, including "Appendix C," which included "Ft Drum Utility Standards." Neither Appendix C nor the other appendices to the PWS are included in the record currently before the court, and it is unclear what requirements with respect to utilities, if any, these documents contain which would be relevant to the issues in the case currently before the court. For this reason, it is difficult to set out with certainty the full picture of the contract's requirements with respect to electrical utilities.

The parties dispute the application to the contract of the IDG referenced in the PWS. As discussed above, it is unclear when or how the IDG was provided to the plaintiff. The IDG is not straightforward or entirely consistent, but establishes goals and themes for construction at Fort Drum, including visual sustainment and antiterrorist goals. Moreover, as indicated below, the IDG includes a waiver request and approval provision if the design guide is not followed in the project. Although there are some confusing references to screening and hiding utilities, as discussed below, the original contract and its incorporated documents, including the IDG, should be read as a whole to determine what it requires. The IDG is a design guide prepared for use in construction on the Fort Drum installation, and it sets forth "standards and general guidelines" governing contractors and government personnel. The IDG states in the "Executive Summary" that:

> Fort Drum's IDG provides design guidance for the following:
>
> Site Planning: directs how and where development should occur, as well as the development pattern
>
> Buildings: establishes the architectural style, proportions, and character building prototypes, as well as an acceptable palette of materials and colors.
>
> Circulation: regulates the hierarchy of streets and pathways, and their overall design character.
>
> Landscape: provides guidance on appropriate means of landscaping a variety of facilities and open spaces, and the appropriate types of plant to use.

> Site Elements: establishes an appropriate palette of exterior furniture, and guidance for the design of pavilions, signage, monuments, and storm water management.
>
> Force Protection: offers guidance on strategies to implement safety and security measures.

Section "Visual Themes" provides that:

> Fort Drum has several Themes that each identify unique visual qualities inherent to the facilities and functions that occur within them. Typical features that establish the visual characteristic include: unique buildings, vehicular and pedestrian corridors, natural features, and how they are arranged on the land.
>
> Each Theme was assessed for its visual assets to determine the good qualities of the Installation, as well as its liabilities – those qualities that needed improvement. Recommendations were made on how to improve liabilities, and how to maintain and build upon assets. Themes include: Troop Village, Community, Airfield, and Residential. A fifth theme – Ranges and Training – is for reference only, and is not assessed for assets, liabilities, or recommendations.
>
> While the current condition for buildings and site features helped to determine the delineations of the Visual Themes, other contributing factors were considered as well. These include:
>
> - ▪ Function
> - ▪ Massing
> - ▪ Physiographic
> - ▪ Political
> - ▪ Operational

(capitalization in original).

> The IDG, at section "Purpose of the IDG," provides:
>
> The purpose of the Installation Design Guide (IDG) is to provide design guidance for standardizing and improving the quality of the total environment of the Installation (Fig 1-1). This includes not only the visual impact of features on the Installation, but also the impact of projects on the total natural and built environment. The improvement of the quality of visual design and development and use of sustainable design and development practices have a direct and future impact on the quality of life for those who live, work, or visit the Installation.
>
> The IDG includes standards and general guidelines for the design issues of site planning; architectural character, colors and materials; vehicular and pedestrian circulation; and landscape elements. This includes plant material, seating, signage, lighting, and utilities. The design guidelines incorporate sustainable design, quality of design, antiterrorism, low

maintenance, historical and cultural resources, natural resources, durability, safety, and compatibility.

(capitalization in original). Section "Audience" of the IDG provides:

The IDG is to be used by all individuals involved in decision-making, design, construction, and maintenance of facilities (Fig 1-2). The primary users include the following:

- Garrison Commander and Staff
- Installation facility planning and design personnel
- Installation facility maintenance personnel
- Installation Management Command and Region
- U.S. Army Corps of Engineers Project Managers, as well as Design and Construction staff
- Consulting Landscape Architects, Planners, Engineers, Interior Designers, and Architects
- Supporting Agencies, such as AAFES, DeCA, MEDCOM, tenants, etc.
- National Guard

The ultimate success of the IDG is dependent upon the commitment of the above individuals and organizations working as a team to apply the Army standards.

(capitalization in original). The "Audience" section indicates that architect-engineer contractors like plaintiff are intended to be bound by the IDG when performing work on the Fort Drum installation.

The section of the IDG "When to Use the IDG" provides:

This IDG provides Installation-specific design data. The general design concepts, recommendations, and standards addressed herein are applicable to the Fort Drum Installation. This document will act as a reference to; acquire recommendations and standards for the design, renovation, and maintenance of all facilities, infrastructure, landscaping, and site elements (regardless of funding source).

(capitalization in original). The section of the IDG titled "Organization of the Document" provides: "This Installation Design Guide is organized to facilitate the preparation and execution of projects, in order: to improve the visual image of the Installation, and ensure that design conforms to Army standards, and includes sustainability."

The IDG's section "Using the Design Guide," provides:

<u>Use this IDG in determining the general design and construction considerations inherent in the preparation of project plans. The IDG provides design guidelines and Army-wide design standards intended to be used in all maintenance, repair, renovation, and new construction projects. The IDG applies to all projects, regardless of the funding source.</u>

17

> The IDG should also be used in developing requirements for programming documents for MCA construction (the DD Form 1391) cost estimates, as well as the preliminary and final designs (from both in-house and external design sources) whenever it involves exterior visual elements on the Installation.

(capitalization in original; emphasis added). Further, a graphic included in the IDG lays out

> the steps for how the design guide is used for the preparation of plans for new construction, renovation, maintenance, and repair projects on the Installation:
>
> - Step 1: Review the Installation Profile information included in Section 4 of this IDG.
> - Step 2:  Review the IDG analysis criteria information contained in Section 3, including design goals and objectives, visual elements, and design principles.
> - Step 3: Review the information and description of the Installation themes in Section 5.
> - Step 4: Select the theme where the project will be located from Section 5, Visual Themes. Review the assets, liabilities, and recommendations for that zone.
> - Step 5: Use the reference matrix to select the appropriate guidelines or standards from the design components specific for the chosen theme. These are addressed in Sections 6 through 11 (site planning, buildings, circulation, landscaping, site elements and force protection). Also reference Appendix A: Installation Design Guide Checklist and Appendix B: Project Requirements Checklist to complete the Design Package. Once these are properly and fully completed by a qualified Architect or Engineer, the project requirements should be well identified and design should move forward without difficulty.

(capitalization in original). The "Implementation" section of the IDG includes the following guidance: "The requirement to use the IDG as a design tool in all facility planning, design, and construction should be included in the: Request for Proposals on new projects, Scopes of Work for new projects, and maintenance agreements." The same section also provides:

> The Design Team IDG Checklist (Appendix A) is to be completed by the design team to ensure that guidelines and standards have been considered in the design process. The checklist, along with concept site plans and elevations for each design submittal, must be filed with project documentation. The accepted checklist will become a part of the project record files.

As noted above, the "Implementation" section in the IDG further provides: "<u>When projects do not adhere to the standards set forth by the IDG, a request of waiver will be submitted</u>

to the Master Planning office for approval. Such justification for a waiver must be documented in the Design Guide Checklist (Appendix A)." (emphasis added). The IDG's "Design Guide Analysis Criteria" includes a section titled "Visual Elements," which, "provides guidance" to the contractor to "[m]inimize the visual impact of utilities by placing them underground or concealing in some fashion." (emphasis added).

In the "Visual Themes" portion of the IDG, discussed above, the IDG identifies the visual themes at Fort Drum, detailing assets, liabilities, and recommendations for each visual theme. In the "Site Elements Recommendations" for the "North Post" area, in the "Troop Village" theme, the IDG states: "Better integrate overhead utilities and utility boxes with the landscape, and whenever possible place utilities underground." (capitalization in original; emphasis added). The same recommendation is made for the "Community" theme. In the "Site Elements Liabilities" for the "South Post" area, in the "Troop Village" theme, the IDG states: "Overhead utilities are prominently visible throughout Theme." In the "Site Elements Liabilities" for the "Community" theme, the IDG states: "There are many instances where mechanical equipment, utilities, or service areas are not screened from public view." In the "Site Elements Assets" for the "Airfield" theme, the IDG includes: "Utilities are underground and are not visually obtrusive." (emphasis added). In the "Site Elements Liabilities" for the "Residential" theme, the IDG states: "Infrastructure/utilities are prominently visible at community entrances."

In the "Building Design" portion of the IDG, the IDG states, under the heading "Service Areas:"

Service areas (such as loading docks, utility access/equipment, and trash dumpsters) will be screened from the views of primary use areas (such as entrances, courtyards, gathering areas, streets, and parking lots). Screening can be an enclosure using walls, berms, landscaping, or any combination thereof. Screen walls should be between six and eight-feet high and should be of compatible materials with the adjacent building.

The "Site Elements Design" portion of the IDG provides:

Introduction

Site elements include outdoor amenities, such as furniture, structures, safety and security, lighting, and utilities. Through the use of style, scale and color, a well-selected palette of site elements will support the unique character of individual visual theme areas while creating a consistent image for the entire Installation. This section provides overall objectives for site elements on the Installation.

Site Element Objectives

Site elements will be selected when plans for the existing and future Installation are prepared. Selection will be governed in part by the existing conditions, in order to match or conform to the current standard of style, color, and materials. To this end, site elements should meet the following objectives:

. . .

- <u>Minimize negative visual impacts of all utility systems</u>.
- Minimize environmental impacts of all utility systems.

(emphasis added). In the "Utilities" section, the "Site Elements Design" portion of the IDG further provides:

Utility systems provide the basic infrastructure of power, communication, water, and sewer services necessary for the operation of the Installation. However, utilities play a key role in the visual quality on an Installation. <u>Their primary impact on the visual quality is the result of the clutter of overhead utility lines and poorly designed storm drainage systems</u>.

<u>The visual and environmental impact of utilities should be minimized on the Installation. Also, the systems should be designed to minimize maintenance and repair. The result is a more sustainable utility system that will promote the overall sustainability of the Installation</u>.

<u>Utilities shall be bored under roads unless otherwise directed</u>.

(emphasis added). The "Utilities" section further provides:

Overhead Transmission Lines

<u>Unsightly overhead utilities should be relocated underground wherever possible to reduce negative visual impacts, as well as to reduce maintenance and repair requirements. Underground utilities are also desirable for protection from terrorist or other enemy attack. When underground locations are not possible, the negative visual impacts should be minimized by using the following design techniques</u>:

Overhead Transmission Lines Location. Overhead transmission lines should be aligned along edges of land use areas, to avoid dividing an area and creating gaps or unusable areas. They should conform to natural landforms that can be utilized to screen them from public view. Hills should be crossed obliquely rather than at right angles. Alignments along hill crests or steep grades should be avoided.

View Screening. Minimize long views or silhouette views of overhead transmission lines from along roads and other public viewing areas. Along, straight, uninterrupted views (such as along roadways), avoid the "tunnel effect" that results from only clearing vegetation threatening the overhead lines within the right-of-way. Jog the alignment of overhead lines at road crossings and periodically undulate. Feature plant materials along the edges of the right-of-way.

Distribution Lines

<u>Power distribution lines should also be located underground to minimize negative visual impact, reduce maintenance, and protect from terrorist or</u>

other enemy attack. <u>If overhead, they should be located out of view from main public visibility areas or screened to be as unobtrusive as possible.</u> Avoid alignments of overhead lines along major circulation corridors. Use minor streets, alleyways, and rear lots, as well as vegetation or topography that provide screening and minimize visual impact. Minimize the number of poles and pole height, and use poles that blend into their surroundings to reduce visual impact. Poles should also be multi-functional (for power, telephone, cable television, street lighting, etc.) to reduce visual clutter.

(emphasis added). The IDG also includes appendices. The "Design Team IDG Checklist" in Appendix A includes the item: "Will all power and other distribution lines be located underground?" The IDG similarly provides in Appendix B a "Project Requirements IDG Checklist," which included under the section "1.4 Utilities Service Requirements" the following: "*NOTE: Enclose underground primary electrical service in concrete from the new utility tie-in points to the pad mounted transformer and/or mechanical room panel boxes.*" (capitalization and emphasis in original).

On March 3, 2016, the parties held a "Design Charrette/Project Kick-off Meeting" to discuss design requirements in anticipation of the 35% milestone. (capitalization in original). According to the Design Charrette meeting attendance roster, included in plaintiff's appendix to its motion for partial summary judgment, the meeting included William Bolton, owner of BES Design/Build, Terry Ward, Assistant Project Manager of BES Design/Build, Contracting Officer Cindy McAleese,[11] Zahid Jamil, Project Manager from Public Works at Fort Drum, and Fred Stone, Acting Chief of Engineering at Fort Drum. Plaintiff insists that "[a]t the Design Charrette Meeting, for the first time, BES was told that all existing aerial electrical utilities would need to be designed underground for the entire Project, despite the fact that this was <u>not</u> included in the PWS." (capitalization and emphasis in original). This requirement, according to plaintiff, necessitated the placing of the electrical utilities in concrete duct banks in order to comply with Fort Drum's utility standards, and the need for such duct banks was also not included in the PWS – an argument plaintiff makes in spite of the inclusion in Appendix B of the IDG, at section 1.4, of a note to "[e]nclose underground primary electrical service in concrete," as noted above. At the Design Charrette meeting, plaintiff, in its third amended complaint, alleges that BES Design/Build

notified the Government that the inclusion of underground electrical utilities represented a change to the Contract because that work was not included in the advertised statement of work and, additionally, that incorporating underground electrical utilities into the design would necessitate a greater

---

[11] Cindy McAleese was the first of three contracting officers to be involved in this project. She was succeeded by Marie McGuire, who was followed by Alfredo Milan Sanchez.

design effort and increases in the Estimated Cost of Construction ("ECC").[12]

(capitalization in original).

On April 11, 2016, plaintiff sent in its 35% design submission with an ECC of $2,006,545.00, along with an "Underground Utilities Alternate" with a cost of $2,871,669.00 additional, equaling a "[t]otal cost of construction Including Alternate" of $4,878,214.00. (capitalization in original). The 35% design stated that "all electric lines will be relocated underground as budget allows," without more on the subject. On April 28, 2016, the Army accepted plaintiff's 35% design submission and included a clear written comment, which stated the Army's position that "[u]tility relocations are not an alternate for construction." The Army paid plaintiff $61,285.62 for the 35% design, although it did not increase the project ECC.

Plaintiff's Assistant Project Manager, Terry Ward, responded to the Army's design comments in an email dated May 5, 2016 to Mr. Stone, stating:

> The utilities relocations will become part of the base bid. The utilities where [sic] separated due to a lack of verbiage in the task order. Updated cost estimates will be included with the 65% submission on 2016-05-16. The initial values amount indicate [sic] the utilities relocation will put the contract <u>minimally</u> over budget.

(emphasis added). Plaintiff did not include an "Underground Utilities Alternate" in any of the subsequent percentage design submissions. Plaintiff sent in its 65% design submission on May 16, 2016, which included an ECC of $5,744,127.00. The 65% design stated that "all electric lines will be relocated underground as budget allows." The Army accepted plaintiff's 65% design on May 31, 2016, including written comments to be incorporated into the design, much as it had for the 35%, with the comment "official approval of submittals is an inherently [sic] government function that is either retained by the KO [contracting officer] or deligated [sic] to the COR [contracting officer's representative]." The Army paid plaintiff $77,717.05 for the 65% design on June 15, 2016, again without increasing the ECC.

Plaintiff submitted its 95% design on July 6, 2016, which included a projected ECC of $5,416,582.00. The next day, on July 7, 2016, Susan Bahng, a contracting officer's representative (COR) at Fort Drum Public Works, sent an email to plaintiff stating that the plaintiff's 95% design was incomplete for failing to incorporate the Army's requested Stormwater Pollution Prevention Plan and "erosion & sediment control plan." Ms. Bahng indicated that she would "hold off on sending out the 95% design for review until we have complete package for the reviewers." According to plaintiff's third amended complaint, at a Milestone Review following submission of the 95% design, the Army "directed Plaintiff to make design changes to the telecommunications duct banks to reduce the number of bends in a telecommunications service run to no more than 180° bends, with no single

---

[12] According to plaintiff's third amended complaint, the Army "reaffirmed its directive to include underground electrical utilities in the design," however, plaintiff's third amended complaint does not specify how the Army reaffirmed this directive to plaintiff.

bend of more than 90°, and without any bend in excess of 180° due to cabling issues," which plaintiff alleges also was a change "not accounted for in the Independent Government Estimate or the 95% ECC." Plaintiff further alleges that the changes "required additional trenching and materials" such that the "request by the Government significantly increased Plaintiff's design effort and the estimated cost of construction." On July 29, 2016, the Army made a partial payment to plaintiff of $43,250.00 for the 95% design, but, according to defendant's motion for partial summary judgment, refrained from making full payment on the request submitted by plaintiff on account of a number of outstanding issues.

On August 17, 2016, representatives of the Army and plaintiff held an "On-Board Review" meeting to discuss the 95% design and address the outstanding issues that had warranted only partial payment, during which the Army provided plaintiff with a number of design comments to be incorporated into the 95% design. According to the On-Board Review meeting minutes, included in plaintiff's appendix to the motion for partial summary judgment, a few comments by defendant specifically referred to electrical utilities, in the context of "Communication drawings": "26. Electrical to building is always concrete;" "27. Secondary: lighting, parking lots, sidewalks or area lighting circuits are not needed to go in concrete;" and "28. Electrical should be 36" down." The On-Board Review meeting minutes further indicate numerous comments made regarding "Electrical drawings," including, as relevant to the case before the court: "16. Primary side – U/Ft U/S /500/ all underground/ We keep the 4 ?????????????"[13] and "26. They want communications and electrical drawings reissued, and taken to the 100%. Resubmit the complete 95% submission. They need all the profiles." In response to inquiries from the Army about the increased ECC, plaintiff's Assistant Project Manager, Mr. Ward, informed the Army that, following the revisions, the original ECC would no longer build the project, and the Army would have to "either remove design items or increase the funding."

The 95% design was resubmitted on September 8, 2016, now including an ECC of $5,187,513.00. On September 12, 2016, the Army responded to plaintiff, asserting that the plaintiff had still failed to include elements called-for in comments to earlier submissions, and on September 26, 2016, the Army provided plaintiff with additional comments on the 95% design, stating that the Army would "need to backcheck[14] 100% design submittal before approving the final design since there are still a number of unresolved comments." The Army's comments included the requirement that the plaintiff, "[i]n order to properly design" the duct banks for the underground utilities, would "need to show all of the other existing and new utilities to ensure that there will be no conflicts" with regard to both electrical and communications utilities. Potential conflicts in electrical and communications utility duct banks were noted in the comments on the 95% design, including the comments that "[t]here are still conflicts with the communication ducts and

---

[13] The series of question marks was included in the On-Board Review meeting minutes.

[14] The parties frequently refer to a "100% backcheck," or similar terms, and parties also make reference to "backcheck review comments," comments made to ensure the final design comported with the government's expectations. The parties' use of these terms appears to be in reference to paragraph "C.5.10 Final Back-Checked" of the SOW.

the electrical ducts," and "[y]ou need to check to ensure that you do not have any conflict with maintenance hole 13 and the electrical duct banks." According to plaintiff, the Army's "directive substantially increased the time and effort required by BES to complete the design" because "Fort Drum did not have complete and accurate as-built drawings to provide BES" for locating existing utility ducts, which necessitated "additional site investigations to find the locations of existing infrastructures and underground utilities and ascertain how deep they were located." Because of these outstanding comments, the Army reserved full acceptance of the 95% design submission and did not pay plaintiff in full for the 95% design at that time. Plaintiff therefore advanced to the 100% design submission, although defendant did ultimately fully pay for the 95% design submission following the Contracting Officer's Final Decision.

On October 19, 2016, plaintiff sent a request by email to Ms. Bahng to submit its 100% design, "without the secondary profiles" for the underground utility ducts. The comments received on the 95% submission had explicitly requested secondary profiles for the underground utility ducts, and Ms. Bahng responded to plaintiff's request by email the same day: "Please submit complete package for 100% backcheck. Partial submittal of 100% design is not acceptable, especially when the missing drawings are in response to addressing the comments provided at 95% review." Plaintiff submitted the 100% design on October 31, 2016, which included an ECC of $5,187,513.00. On November 4, 2016, plaintiff sent an invoice to the Army for the "[b]alance due from 95% [design] ($21,931.550 plus the 100% schedule of values ($35,760.65)." The Army, however, declined to accept the invoice "until 100% Design is accepted and all of the required deliverables have been submitted." The Army stated that "[o]nce all of the comments have been resolved," the Army would accept the invoice.

On November 21, 2016, the Army emailed plaintiff to "schedule a conference call to discuss the backcheck review comments" and outlined a number of "major concerns" the Army wished to address. Plaintiff submitted a revised 100% design on December 12, 2016, again with an ECC of $5,187,513.00. On December 22, 2016, the Army responded with "100% backcheck comments" to be incorporated into the next submission and did not accept the 100% design. The backcheck comments indicated continuing concern over utility bank conflicts, such as the comment that "[y]ou also show on numerous profiles where the existing communication duct bank is in the same location as the new duct bank." On January 23, 2017, plaintiff submitted its 100% design for the third time, with the same ECC as the two previous 100% design submissions. On February 6, 2017, the Army refused to accept the submitted 100% design for the third time because the "[s]ubmitted drawings d[id] not reflect any of the changes stated in the comments." The Army issued modification W911S2-16-D-8000-0001-02 to the contract on April 24, 2017, which extended the period of performance on the contract to September 30, 2017.

Plaintiff submitted a fourth version of the 100% design on July 21, 2017, this time with an ECC of $11,821,977.00. Plaintiff submitted this version of the 100% design two additional times, once on September 19, 2017, with an ECC of $11,821,977.00, and once

on September 29, 2017, with an ECC of $11,763,928.00.[15] When the Army inquired into the more-than-doubled ECC between the January 2017 and September 2017 100% design submissions, plaintiff explained that "the project never was estimated to be within the Limits of Funding, which as we discussed yesterday, was attributable to the direction at the Design Charette to the design team to put all the electrical underground." According to Mr. Stone's deposition, included in the appendix attached to plaintiff's motion for partial summary judgment, "somebody made a verbal acceptance of the 100 percent submittal," of which verbal acceptance Mr. Stone indicated he had knowledge at the time. According to Mr. Stone's deposition, however, Mr. Stone had no "idea who that person would have been" who made the alleged verbal acceptance.

On September 28, 2017, Joseph Banach, Managing Partner of BES Design/Build, met with Mr. Stone, Fort Drum's Acting Chief of Engineering, and then Contracting Officer Marie McGuire. At the meeting, BES Design/Build was advised by Ms. McGuire "to submit a Request for Equitable Adjustment ('REA')" for an increased design fee in light of the plaintiff's claimed ECC. Plaintiff submitted an REA on October 17, 2017, "in the amount of $438,000 for consideration due to the additional design cost and professional liability that BES Design/Build has incurred on this project as a result of the direction provided at the Design 35% Milestone meeting." The REA stated that "[a]t the Concept review meeting[16] the direction and understanding provided by Mr. Fred Stone, Mr. John Desilas and Mr. Scott Murphy was that the intent was to put the utilities underground and that this would not be considered an option but a requirement (Encl. 3&4)." (capitalization in original). Plaintiff's REA calculated the amount of the REA "based on 6% of the variance between the $11.8M final cost estimate and the $4.5M Limit of Construction." (capitalization in original).

In an internal October 19, 2017 email, Fort Drum's Acting Chief of Engineering, Mr. Stone indicated that

> we have not officially accepted the 100% design. Based on the recent events, it is my recommendation that the 100% submittal be official [sic] rejected and the verbal acceptance be withdrawn based on the contractor's recent claim for equitable adjustment.
>
> In my opinion, the current draft progress payment for the 100% design must be rejected unit [sic] we resolve the outstanding issues. Acceptance of the progress payment is tacit acceptance of the work.

On October 27, 2017, plaintiff reached out to the Army for "an update as to the progress towards approving the Final Design," and the Army replied that "[t]he progress on the final

---

[15] According to BES Design/Build, plaintiff removed the ".05% Builders Risk" line item on September 28, 2017, which accounted for a slight decrease in the ECC in the September 29, 2017 submission of its 100% design submission.

[16] The "Concept review meeting" referenced in plaintiff's REA is not otherwise documented in the third amended complaint, the cross-motions for partial summary judgment, or the record before the court. Based on plaintiff's description, the Concept review meeting appears to have occurred following plaintiff's 35% design submission.

design is that it has not been approved because it was over budget and there has been nothing through contracting for adjustments" and also that "I have been directed not pay for any work until it is acceptable to contracting." Despite the language of Mr. Stone's October 19, 2017 email that "the verbal acceptance be withdrawn," defendant states in its motion for partial summary judgment that "[t]he Army never accepted the 100% design."

Plaintiff provided additional information to supplement the REA in response to requests for clarification from the Army on November 13, 2017, December 5, 2017, and February 12, 2018. Plaintiff inquired of the Army seeking information on the Army's decision regarding plaintiff's REA on April 23, 2018, and again on May 7, 2018. In response to plaintiff's May 7, 2018 inquiry, the then Contracting Officer, Ms. McGuire, informed plaintiff that she would have a response to BES Design/Build the following week, however, according to plaintiff, the plaintiff received no response.

On July 30, 2018, plaintiff submitted its certified claim for $446,051.62 to Contracting Officer McGuire, "based on 6% of the variance between the $11.8M final cost estimate and the $4.5M Limit of Construction." According to defendant's motion for partial summary judgment in this court, the plaintiff's certified claim "contained no information setting forth the effort required by the alleged requirements change," and instead represented the "full 6% of the delta between the $4.5 million estimated cost of construction limit and BESDB's own estimation that the project as designed would cost $11.8 million to construct, or an additional $446,051.62."

On June 26, 2019, almost two years after plaintiff submitted the fourth version of the 100% design to the Army, the Army issued a partial termination for convenience of the contract to plaintiff. The partial termination for convenience partially terminated the 95% design, which at the time of the termination had an outstanding balance of $21,931.55 following the July 29, 2016 partial payment, and fully terminated the 100% design and the RFI/Bidding Credit, worth $35,760.65 and $16,358.18, respectively. On September 27, 2019, the Army denied plaintiff's certified claim in a Contracting Officer's Final Decision, issued by then Contracting Officer Sanchez, on the basis that the Contracting Officer could not "find where the Contracting Officer approved the increases in the Estimated Cost of Construction (ECC) at the 65%, and 100% design submissions nor where the Government accepted the 100% Final Design for this project." The Contracting Officer's Final Decision awarded plaintiff "the remainder of the Design 95% ($4.5M ECC) in the amount of $21,931.55" because "[a] portion of the Design 95% was invoiced and approved by the Contracting Officer at the time, therefore it can be construed that portion was accepted by the Government." A final payment of $21,931.55 was made to plaintiff on September 30, 2019.

> In plaintiff's third amended complaint filed in this court, plaintiff claims that it
>
> has not been compensated for its 100% design submittal, nor has it been compensated for the increased design fee due Plaintiff as a result of the Government's directives to alter the design to include underground electrical utilities, an outside fiber optic cable, and the inclusion of existing utility duct bank profiles, which increased the estimated cost of construction

to over $11.7 million, approximately $7.3 million more than the original Independent Government Estimate and ECC.

(capitalization in original). According to plaintiff, based on all the contract documents, the instruction to place utilities underground was beyond the scope of the contract. Also according to plaintiff, as of the time of the partial termination, the Army owed plaintiff for its 100% design submissions, for which plaintiff claimed a fee of $35,760.65, as well as the $446,051.62 requested in plaintiff's certified claim.

Plaintiff filed its initial complaint in this court on December 13, 2019. As noted above, the complaint was titled "Notice of Appeal," consisted of a single page, and described itself as a "Notice of Appeal to the United States Court of Federal Claims from the Contracting Officer's Final Decision ('COFD'), which was issued on BESDB's claim on Contract Task Order W911S2-16-D-800-0001 on December 13, 2018." As indicated in the court's December 16, 2019 Order, plaintiff's initial complaint "did not indicate what monetary damages plaintiff was seeking, and did not provide any factual information about the claim except to note the date of the contracting officer's final decision and the number of plaintiff's task order contract." The court ordered plaintiff to submit a new filing which corrects these and other issues and which "conforms to the Rules of the United States Court of Federal Claims." Plaintiff filed an amended complaint on February 20, 2020, in which plaintiff asserted three causes of action: "Count I – Breach of Contract," "Count II – Unjust Enrichment," and "Count III – Breach of Good Faith and Fair Dealing." Defendant filed its answer to plaintiff's amended complaint on May 5, 2020. Subsequently, plaintiff filed its second amended complaint on May 22, 2020, asserting only two causes of action: "Count I – Breach of Contract," and "Count II – Breach of Good Faith and Fair Dealing." Defendant filed its answer to plaintiff's second amended complaint on June 5, 2020. Thereafter, plaintiff filed a third amended complaint on September 4, 2020, asserting two causes of action: "Count I – Breach of Contract – Failure to Pay," and "Count II – Changes." After discovery, a trial in the above captioned case was scheduled to commence on February 8, 2021. On January 27, 2021, plaintiff and defendant filed a joint motion to continue the trial, "to permit the parties to file and fully brief cross Motions for Summary Judgment." Following an in depth discussion with parties at a status conference, and pursuant to the parties' request, the court canceled the scheduled trial. Subsequently, defendant filed its motion for partial summary judgment on Count Two of plaintiff's third amended complaint, followed by plaintiff's response to defendant's motion for partial summary judgment and a cross-motion for partial summary judgment on Count Two of plaintiff's third amended complaint. The cross-motions have been fully briefed and oral argument was held on the cross-motions.

## DISCUSSION

In this court, defendant moves for partial summary judgment on Count Two[17] of plaintiff's third amended complaint, pursuant to Rule 56 (2020) of the Rules of the Court of Federal Claims (RCFC). Defendant's motion cites isolated sections of the relevant documents and argues that the design fee limitation clause included in the contract,

---

[17] Count One of plaintiff's third amended complaint, "Breach of Contract – Failure to Pay," is not the subject of either party's current motion for partial summary judgment.

DFARS 236.606-70, "Statutory fee limitation," does not permit plaintiff to recover automatically for an increased ECC, particularly when the increase is only proposed by the contractor and not accepted by the government. Defendant argues that DFARS 236.606-70 applies the design fee limitation "only to the design-specific services to be provided under the architect-engineer contract, and is calculated based on the Government's estimated cost of the construction project at the time the contract is entered into." Further, defendant argues, "the design fee can only increase in specific situations, and does not automatically increase based on the contractor's estimated cost of construction," and that "a central tenet of Federal procurement law is that contracts may not be drafted in a way that ties the costs a contractor incurs to the fee that it receives under the contract." According to defendant, "[t]he only way by which BESDB [BES Design/Build] could be entitled to an increase in its design fee would be in conjunction with the design within funding limitations clause – FAR 52.236-22 – which gives the Government the option to increase the estimated cost of construction at its discretion," but "[t]hough BESDB submitted designs estimating the cost as over the Army's $4 million estimate, the Army did not determine that the construction cost would need to be increased." (capitalization in original).

Defendant additionally argues that plaintiff cannot recover because plaintiff has failed to provide appropriate cost data to support its claim in either plaintiff's certified claim or plaintiff's request for equitable adjustment. According to defendant, "[n]either the request for equitable adjustment nor certified claim seek recovery based on the effort involved in performing the allegedly out-of-scope work," relying instead on six percent of the difference between plaintiff's final ECC and the contract's ceiling price of $4,500,000.00. Defendant argues that "BESDB's own submissions to the Army concede that the amount it seeks includes work that was included in the base bid," a discrepancy which, according to defendant, was not rectified by the later submission of supplemental information to the contracting officer in support of the request for equitable adjustment.

Plaintiff responded to defendant's motion for partial summary judgment and filed a cross-motion for partial summary judgment on Count Two of the third amended complaint pursuant to RCFC 56. Plaintiff's response argues that defendant has misrepresented the text and meaning of DFARS 236.606-70. In particular, plaintiff argues that DFARS 236.606-70 does not limit the contractor's design fee to six percent of the estimated cost of construction at the time the contract is formed, and that the text of DFARS 236.606-70 contemplates the application of the six percent limit to work not originally required by the contract. Also citing isolated portions of the relevant documents, plaintiff argues that the PWS referred to relocating utilities underground in the context of communications utilities, but not electrical utilities. According to plaintiff, "[i]ncluding the word 'underground' in the section governing communications utilities, but excluding it from the immediately preceding section, on the same page, must mean that it was intentionally excluded from the section governing electrical utilities." Therefore, according to plaintiff, the Army's requirement to relocate overhead electrical utilities underground "constitut[ed] a constructive change order" by which plaintiff "is entitled to a change order as a matter of law." Plaintiff further argues, in response to defendant's argument that plaintiff's claim is unsupported by sufficient cost data to show the value of the work attributable to the alleged change, that "BES in fact incurred costs that exceeded the amount of the six

percent of the increased estimated cost of construction." According to plaintiff, because "BES's fee is statutorily set at six percent of the total estimated construction, or, if subsequent modifications are made, six percent of the revised total construction cost," plaintiff's claim "is not for the entire amount of its costs, but instead is submitted as the statutorily authorized percentage of the estimated cost of construction." According to plaintiff, "BES provided its costs data to the Government on numerous occasions in support of its request for compensation." Moreover, according to plaintiff, in both the REA and the certified claim, "BES submitted actual cost data [sic] Government." Plaintiff contends it supplemented its REA in response to the contracting officer's request for additional information with "a spreadsheet documenting the increased costs incurred as a result of the increased design work," which "was also fully supported by timesheets verifying actual hours worked as well as invoices." According to plaintiff, "[t]hat documentation was also included in BES's Certified Claim." Plaintiff argues that, at a minimum, all this information "creat[ed] an issue of fact, making summary judgment inappropriate."

Additionally, plaintiff's cross-motion for partial summary judgment on Count Two of plaintiff's third amended complaint argues that the documents which created the contract between plaintiff and the Army did not include a requirement that electrical utilities be placed underground, so the Army's direction to relocate electrical utilities underground "constitute[d] a constructive change" to the contract. Plaintiff argues that "the language of the Task Order plainly and unambiguously does not require underground electrical utilities," (emphasis in original). As also noted above, plaintiff tries to rely on the dichotomy between the electrical utilities section of the PWS noting that "[c]uriously absent from that section is any reference to anything being located or designed underground" and the immediately following communications utilities section. Plaintiff argues that "[b]y including the word 'underground' in the section governing communications utilities, but excluding it from the _immediately preceding section_, _on the same page_, must mean that it was intentionally excluded from the section governing electrical utilities." (all emphasis in original). Plaintiff argues that "[t]he doctrine of _expressio unius est exclusio alterius_[18] applies, and the inclusion of the word 'underground' as it relates to communications utilities implies the exclusion of the word 'underground' as it relates to electrical utilities." (emphasis in original). Plaintiff further argues that this

> analysis can lead to only one interpretation of the language of the Task Order: communications utilities were required to be relocated underground, but electrical utilities were not required to be relocated underground. Therefore, underground electrical utilities are outside the scope of the Task Order and any requirement or directive of the Government to place electrical utilities underground constituted a change order.

(emphasis in original). Plaintiff further argues that the Army's requirement that plaintiff "design underground electrical utilities" amounted to an order that exceeded the contract's scope of work and, therefore, "constitute[d] a constructive change" entitling plaintiff to

---

[18] "A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." Black's Law Dictionary (11th ed. 2019).

relief. Plaintiff, quoting <u>Wunderlich Contracting Co. v. United States</u>, 173 Ct. Cl. 180, 199 (1965), contends that BES Design/Build "'need not prove damages with absolute certainty or mathematical exactitude'" to recover, but need only "'furnish[] the court with a reasonable basis for computation,'" which plaintiff claims to have done by submitting actual cost data in support of its REA and certified claim.

Defendant responds that "[t]he only issue necessary to be determined in entering summary judgment here is the correct application of Defense Federal Acquisition Regulation System (DFARS) 236.606-70." Defendant argues that in architect-engineer contracts, "the fee limitation is established <u>at the time the contract is entered into</u>." (emphasis in original). Defendant further argues that FAR 52.236-22, "Design Within Funding Limitations (Apr 1984)," "states that the estimated cost of construction can only be increased in specific situations, namely where the architect-engineer contractor requests that the Government raise the estimated cost, and the Government does so," which according to defendant, "BES did not do so here." (capitalization in original). According to defendant, plaintiff's documents containing its alleged cost data to support its REA and certified claim "fail to specifically segregate costs incurred for the claimed changes alone, and lack sufficient detail to determine that the costs were in fact incurred for extra work and not simply for original contract work," and therefore cannot support plaintiff's claims. Defendant also argues that "from the start of performance, the contract documents required BESDB to place some electrical underground and to encase some parts in concrete. Thus, this was not additional work that would have resulted in any increased costs." Defendant points out that the IDG indicates that "[u]nsightly overhead utilities should be relocated underground wherever possible" and that "[p]ower distribution lines should also be located underground," as part of its argument that "the contract incorporated the Fort Drum IDG in its requirements," including that the IDG required that "where practicable and possible, electrical utility lines were to be located underground." Moreover, defendant argues that even if the requirement were not included in the contract, the alleged constructive change was not approved by an individual with authority to bind the government, and plaintiff did not notify the government of a perceived change, as required by the contract.

In its reply brief, plaintiff again urges that "[t]he plain language of the Performance Work Statement . . . specifically required telecommunications to be relocated underground," while "the section governing electrical utilities excluded any reference to anything being located underground," and argues that the IDG, upon which defendant relies, "is replete with language that is permissive – not mandatory – and does not impose any affirmative contractual obligation on BES." Plaintiff further argues that the order to place electrical utilities underground came from an official with authority to bind the government or, in the alternative, was ratified by an official with such authority, namely the contracting officer at the Design Charrette meeting, Ms. McAleese, who plaintiff alleges "made no attempt to stop Mr. Stone (or anyone else) from directing or demanding work outside the scope of the IDIQ contract." Additionally, plaintiff asserts that it properly notified the Army that a change to the contract had occurred and that its REA and certified claim were supported by proper cost data.

RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2021); see also Young v. United Parcel Serv., Inc., 135 S. Ct. 1338, 1355 (2015), Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Shell Oil Co. v. United States, 7 F.4th 1165, 1171 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1014 (Fed. Cir. 2021); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); BASF Corp. v. SNF Holding Co., 955 F.3d 958, 963 (Fed. Cir. 2020); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick

Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment
>
> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)) (citation omitted), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all

presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; Univ. South Florida v. United States, 146 Fed. Cl. 274, 280 (2019).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015), subsequent determination, 129 Fed. Cl. 742 (2017), aff'd, 708 F. App'x 685 (Fed. Cir. 2018). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Fla. Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party

has provided evidence sufficient, if unopposed, to prevail as a matter of law." <u>Saab Cars USA, Inc. v. United States</u>, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. <u>See</u> <u>Prineville Sawmill Co. v. United States</u>, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); <u>see</u> <u>also</u> <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d at 968-69<u>; Bubble Room, Inc. v. United States</u>, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), <u>reh'g</u> <u>denied</u> <u>and</u> <u>en</u> <u>banc</u> <u>suggestion</u> <u>declined</u> (Fed. Cir. 1999); <u>Massey v. Del Labs., Inc.</u>, 118 F.3d 1568, 1573 (Fed. Cir. 1997); <u>B.F. Goodrich Co. v. U.S. Filter Corp.</u>, 245 F.3d 587, 593 (6th Cir. 2001); <u>Atl. Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1148 (10th Cir. 2000); <u>Chevron USA, Inc. v. Cayetano</u>, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), <u>cert. denied</u>, 532 U.S. 942 (2001); <u>Allstate Ins. Co. v. Occidental Int'l, Inc.</u>, 140 F.3d 1, 2 (1st Cir. 1998); <u>LewRon Television, Inc. v. D.H. Overmyer Leasing Co.</u>, 401 F.2d 689, 692 (4th Cir. 1968), <u>cert.</u> <u>denied</u>, 393 U.S. 1083 (1969); <u>Rogers v. United States</u>, 90 Fed. Cl. 418, 427 (2009), <u>subsequent</u> <u>determination</u>, 93 Fed. Cl. 607 (2010), <u>aff'd</u>, 814 F.3d 1299 (2015); <u>Consol. Coal Co. v. United States</u>, 86 Fed. Cl. 384, 387 (2009), <u>aff'd</u>, 615 F.3d 1378 (Fed. Cir.), <u>and</u> <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2010), <u>cert.</u> <u>denied</u>, 564 U.S. 1004 (2011); <u>St. Christopher Assocs., L.P. v. United States</u>, 75 Fed. Cl. 1, 8 (2006), <u>aff'd</u>, 511 F.3d 1376 (Fed. Cir. 2008); <u>Reading & Bates Corp. v. United States</u>, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. <u>See</u> <u>First Commerce Corp. v. United States</u>, 335 F.3d 1373, 1379 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2003); <u>see</u> <u>also</u> <u>DeMarini Sports, Inc. v. Worth, Inc.</u>, 239 F.3d 1314, 1322 (Fed. Cir. 2001); <u>Gart v. Logitech, Inc.</u>, 254 F.3d 1334, 1338-39 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2001), <u>cert.</u> <u>denied</u>, 534 U.S. 1114 (2002); <u>Oswalt v. United States</u>, 85 Fed. Cl. 153, 158 (2008); <u>Telenor Satellite Servs., Inc. v. United States</u>, 71 Fed. Cl. 114, 119 (2006).

In the case currently before the court, the parties have raised issues of contract interpretation including plaintiff's argument that "the language of the Task Order plainly and unambiguously does <u>not</u> require underground electrical utilities." (emphasis in original). Defendant responds that "from the start of performance, the contract documents required BESDB to place some electrical underground and to encase some parts in concrete," whereas plaintiff argues that the contract did not require underground placement for any of the utilities. "Contract interpretation starts with the language of the contract." <u>SUFI Network Servs., Inc. v. United States</u>, 785 F.3d 585, 593 (Fed. Cir. 2015); <u>see</u> <u>also</u> <u>NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.</u>, 997 F.3d 1159, 1165 (Fed. Cir. 2021); <u>Authentic Apparel Grp., LLC v. United States</u>, 989 F.3d at 1014; <u>Premier Office Complex of Parma, LLC v. United States</u>, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); <u>Precision</u>

Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); HCIC Enters., LLC v. United States, 147 Fed. Cl. 118, 124 (2020); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d at 1034) ("The starting point for any contract interpretation is the plain language of the agreement."), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483-84 (2013).

"""In contract interpretation, the plain and unambiguous meaning of a written agreement controls.""" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347, recons. denied, 131 Fed. Cl. 528 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996) (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Prof'l, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014); McHugh v. DLT Sols., Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (citations omitted)); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of

Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015); see also Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

The Federal Circuit also has indicated that "'[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d at 1380-81); see also LAI Servs., Inc. v. Gates, 573 F.3d at 1314; Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d at 1200; Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)); Beard v. United States, 125 Fed. Cl. at 158 ("In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but 'construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.'" (quoting Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008))).

It has been "'a fundamental precept of common law that the intention of the parties to a contract controls its interpretation.'" Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (quoting Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct. Cl. 21, 30 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is

determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer . . . ."); LaBatte v. United States, 142 Fed. Cl. 425, 433 (2019) (citations omitted); Canpro Invs. Ltd. v. United States, 130 Fed. Cl. at 347 ("Contract interpretation requires determining the intention of the parties.").

As noted above, this court is presented with cross-motions for partial summary judgment on Count Two of the plaintiff's third amended complaint regarding plaintiff's alleged "entitle[ment] to a change order to increase the ECC to account for the Government-directed changes to the design requirements" and corresponding entitlement to an increased design fee. Although the parties have filed cross-motions for partial-summary judgment, and motions for summary judgment may only be filed if a party believes no material facts are in dispute, the court has an independent duty to determine whether a genuine issue of material fact exists. See Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69. According to defendant, "[n]o material facts are in dispute and plaintiff has failed to prove the essential elements of its claim." While plaintiff does not explicitly state that no genuine issues of material fact exist with respect to its cross-motion for summary judgment on Count Two, plaintiff does argue that it

> is entitled to partial summary judgment on Count II of its Third Amended Complaint, and an award of damages in the amount of $435,835.68, representing 6% of the difference between the LOC ($4,500,000) and the 100% Backcheck Cost of Construction ($11,763,928), plus interest from July 30, 2018 until the date it is paid.

As indicated above, when responding to defendant's motion for partial summary judgment, plaintiff argues that BES Design/Build has at minimum "creat[ed] an issue of fact, making summary judgment inappropriate." Plaintiff alleges that BES tried to inform the Army in some fashion that the contractor perceived changes to the contract were occurring, at first, by responding to the Army's stated requirements regarding underground utilities at the Design Charrette meeting, and then by including increasing ECCs in the 35%, 65%, 95%, and 100% written submissions to successive contracting officers. Questions remain, however, regarding whether what plaintiff did was sufficient and whether a change in accordance with the contract documents, in fact, occurred. Plaintiff's response that placing the utilities underground was a change at the Design Charrette meeting appears to have been oral. The design submissions, at 35% and 65%, as well as multiple 95% submissions and multiple 100% submissions, were submitted in writing to successive contracting officers, and each included plaintiff's revised ECC numbers, which, as described above, increased over the course of the successive submissions, except for the first 95% submission, when the ECC decreased from $5,744,127.00 to $5,416,582.00, the second 95% submission, when the ECC decreased further to $5,187,513.00, and the first and second 100% submission, when the ECC remained at $5,187,513.00. Whether plaintiff's method of submissions met the notification requirements by which the contractor was required to notify the government of changes

to the contract in writing, pursuant to FAR 52.236-22 and FAR 52.243-7, and included in the contract, is not clear.

Moreover, interpretation of the requirements of the contract regarding the placement of the electrical utilities underground and the consequential encasing requirements are also not clear and the parties are not in agreement. Plaintiff argues that the contract into which the parties entered did not require underground electrical utilities, and that defendant's requirement to include underground utilities constituted a change to the contract. Count Two of plaintiff's third amended complaint alleges that "[t]he Government made various changes to the Plaintiff's scope of work under the Contract" which increased the project's ECC and for which "Plaintiff is entitled to a change order to increase the ECC to account for the Government-directed changes to the design requirements, but the Government failed to issue such a change." Therefore, plaintiff asserts it "was entitled to an increase in its six percent design fee to account for the increase in the estimated cost of construction, but the Government issued no such change." Plaintiff claims entitlement to the additional payment based on DFARS 236.606-70, "Statutory fee limitation," to which this contract was subject in accordance with 10 U.S.C. § 4540 (2012). The statute at 10 U.S.C § 4540 provided in relevant part: "[t]he fee for any service under this section may not be more than 6 percent of the estimated cost, as determined by the Secretary, of the project to which it applies." 10 U.S.C. § 4540 (2012) (emphasis added).[19] Defendant argues that plaintiff's claim fails because it converts "the design fee limit in DFARS 236.606-70" into "a floor," while according to the law, "the design fee can only increase in specific situations, and does not automatically increase based on the contractor's estimate cost of construction, as BESDB contends." (emphasis in original). Defendant argues that because the contract specifies a firm fixed price for the contract,[20] and "the contract does not contemplate an automatic increase in the fee," the plaintiff has no grounds to seek an automatic increase of its fee based on its own calculated ECC included in the plaintiff's final 100% design submission. Plaintiff argues, however, that DFARS 236.606-70, by its own language, applies "[t]he six percent limit . . . to contract modifications" with its instruction to "[a]pply the six percent limit to the

---

[19] As discussed above, 10 U.S.C. § 4540 has, since the time of the contract performance in this case, been recodified at 10 U.S.C. § 7540 (2018). See Pub. L. No. 115-232, § 808(c)(2), 132 Stat. 1636, 1839 (2018).

[20] As noted above, the modification set firm fixed prices for each stage of performance as follows:

| | |
|---|---|
| 1. Field Investigation (Non-Design) | $113,881.66 |
| 2. Design – 35% | $61,285.31 |
| 3. Design – 65% | $77,717.05 |
| 4. Design – 95% | $65,181.55 |
| 5. Design – 100% | $35,760.65 |
| 6. RFI & Bidding | $16,358.18 |
| 6. [sic] Construction Services | $ - |
| Totals | $370,184.41 |

revised total estimated construction cost" in the case of "[w]ork not initially included in the contract." DFARS 236.606-70(b)(1). Plaintiff argues that the Army ordered plaintiff to complete work not initially included in the contract, and thereby entitled plaintiff to recover on a theory of constructive change to the contract, in an amount which plaintiff sets at approximately six percent of the ECC included in its final 100% design submission.

As presented to the court in the cross-motions for partial summary judgment, multiple issues of contract interpretation and fact remain at issue, including a key question of whether the contract required utilities to be placed underground and installed in duct banks, as well as the application of the relevant regulations, such as DFARS 236.606. As discussed above, contract interpretation "begins with the language of the written agreement." Premier Office Complex of Parma, LLC v. United States, 916 F.3d at 1011. The contract incorporated, in full, the text of FAR 52.236-22, "Design Within Funding Limitations (Apr 1984)," which provides in relevant part:

> (a) The Contractor shall accomplish the design services required under this contract so as to permit the award of a contract, using standard Federal Acquisition Regulation procedures for the construction of the facilities designed at a price that does not exceed the estimated construction contract price as set forth in paragraph (c) below. When bids or proposals for the construction contract are received that exceed the estimated price, the contractor shall perform such redesign and other services as are necessary to permit contract award within the funding limitation. These additional services shall be performed at no increase in the price of this contract. However, the Contractor shall not be required to perform such additional services at no cost to the Government if the unfavorable bids or proposals are the result of conditions beyond its reasonable control.

> (b) The Contractor will promptly advise the Contracting Officer if it finds that the project being designed will exceed or is likely to exceed the funding limitations and it is unable to design a usable facility within these limitations. Upon receipt of such information, the Contracting Officer will review the Contractor's revised estimate of construction cost. The Government may, if it determines that the estimated cost of construction contract price set forth in this contract is so low that award of a construction contract not in excess of such estimate is improbable, authorize a change in scope or materials required to reduce the estimated construction cost to an amount within the estimated construction contract price set forth in paragraph (c) below, or the Government may adjust such estimated construction contract price.

FAR 52.236-22(a)-(b). (capitalization in original).

DFARS 236.606-70, "Statutory fee limitation," which the parties agree applies to the contract, provides in relevant part:

(a) 10 U.S.C. 4540, 7212, and 9540 limit the contract price (or fee) for architect-engineer services for the preparation of designs, plans, drawings, and specifications to six percent of the project's estimated construction cost.

(b) The six percent limit also applies to contract modifications, including modifications involving-

(1) work not initially included in the contract. Apply the six percent limit to the revised total estimated construction cost.

(2) *Redesign.* Apply the six percent limit as follows-

(i) Add the estimated construction cost of the redesign features to the original estimated construction cost;

(ii) Add the contract cost for the original design to the contract cost for redesign; and

(iii) Divide the total contract design cost by the total estimated construction cost. The resulting percentage may not exceed the six percent statutory limitation.

(c) The six percent limit applies only to that portion of the contract (or modification) price attributable to the preparation of designs, plans, drawings, and specifications. If a contract or modification also includes other services, the part of the price attributable to the other services is not subject to the six percent limit.

DFARS 236.606-70. (emphasis in original).

Although the court agrees with defendant that the regulation at DFARS 236.606-70 sets an upper limit on the design fee in an architect-engineer contract and fixes that limit to a percentage of the estimated construction cost, the court notes that DFARS 236.606-70 also allows for the possibility of revising the estimated construction cost as a result of contract modifications. See DFARS 236.606-70(a)-(b). Therefore, the language of DFARS 236.606-70 contemplates a possible adjustment of the design fee based on changes to the ECC after contract performance in the above captioned case has begun.

The contract in the case before the court also incorporated FAR 52.236-22, "Design Within Funding Limitations (Apr 1984)," which requires the contractor to "promptly advise the Contracting Officer if it finds that the project being designed will exceed or is likely to exceed the funding limitations and it is unable to design a usable facility within these limitations." FAR 52.236-22(b). After notification, the government will determine if an adjustment of the cost estimate is appropriate, and the clause gives the government the discretion to raise or not raise the estimated cost of construction. See id. The language of DFARS 236.606-70 and FAR 52.236-22, when read together, demonstrate that, while the statutory design fee limitation can be adjusted upward to account for increases to the ECC, such increases to the ECC are effected by the government in response to the contractor "promptly advis[ing] the Contracting Officer" of the necessity of such an increase and the government deciding the adjustment is appropriate. See id.

On October 27, 2017, plaintiff inquired regarding the progress of the Army's approval of plaintiff's final design, to which the Army replied, "[t]he progress on the final design is that it has not been approved because it was over budget . . . ." Although an email from Fort Drum's Acting Chief of Engineering Mr. Stone, and Mr. Stone's deposition testimony, expressed a belief that someone at the Army verbally accepted plaintiff's 100% final design, which could have included verbal acknowledgment of plaintiff's proposed, increased ECC, Mr. Stone could not identify the individual and the record before the court does not disclose such approval. The record before the court does not fully resolve whether a government official with proper authority verbally, in writing, or by action, approved the increased ECC as proposed by the plaintiff in successive percentage submissions, in part because the plaintiff was paid for all but the 100% submissions. Plaintiff, however, argues that plaintiff's objections to defendant stating electrical utilities must be relocated underground occurred immediately at the Design Charrette meeting with the contracting officer present and then in writing in the various percentage submissions to the government amounted to prompt notice.

The cross-motions for partial summary judgment as presented to the court also do not resolve whether the contract between the Army and the plaintiff required the plaintiff to relocate all electrical utilities underground and whether the government's order to do so constituted a change to the contract. Moreover, even if a change occurred, the issue remains whether plaintiff followed the required written submissions to properly effect entitlement to increased fees for that change. It is important to note that as presented to the court in the cross-motions, the parties dispute the meaning of the contract's specifications in the agreement between the parties and the intent of the parties regarding the placement of electrical utilities. Defendant argues that the contract required at least "some" electrical utilities to be placed underground, not that all the utilities needed to be placed underground. (emphasis added). The defendant, however, does not specify if the "some" refers to specific utilities or a percentage of all utilities. This is in sharp contrast to plaintiff's argument that "the language of the Task Order plainly and unambiguously does not require underground electrical utilities." (emphasis in original).

The contract makes clear, in two incorporated clauses, FAR 52.216-18, "Ordering (Oct 1985)," and DFARS 252.216-7006, "Ordering (May 2011)," that while all "services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders," any task order will be "subject to the terms and conditions of this contract," with any conflict between the task order and contract being resolved in favor of the contract's terms. See DFARS 252.216-7006(a)-(b); FAR 52.216-18(a)-(b). Accordingly, the terms and conditions of the contract were incorporated into the task order.

Section "C.8.8.2 Interim Design Drawings," of the SOW provided that the interim design drawings would include, in relevant part:

ii. Removal and/or Relocation plans: Indicate all items of work that require removal or relocation. Provide dimensions for removal items such as

pavement, curbs, sidewalks, utilities, buildings, walls, partitions, or other site features proposed for removal or relocation.

. . .

v. Utility Plan: The utility plan will <u>identify and locate</u> water lines, sanitary sewers, natural gas, <u>electrical</u>, communications, and <u>other subsurface utility features</u>.

. . .

vii. Utility Profiles: Provide profiles for all storm drainage systems, sewer lines, water lines, and telecommunications duct banks. Indicate invert elevations, ground profiles and new and existing structures and utility crossings.

(emphasis added). Section C.8.8.2 of the SOW referred to "electrical" as one category of utilities in a list ending in "<u>and other subsurface utility features</u>." (emphasis added). A later section of the SOW, "C.13.6 Final Design," further provided:

b. Drawings: Final drawings will show all pertinent plans, elevations, sections, details, schedules, and notes to present a complete description of the construction requirements. All elements will be properly annotated and located with proper dimensions.

(1) Exterior Electrical Drawings will include:

(i) Details which clearly depict the installation requirements of overhead and underground supply and utilization equipment[.]

(capitalization in original). Although not by itself dispositive, as indicated above regarding Interim Design Drawings, the requirement that Exterior Electrical Drawings include "details which clearly depict the installation requirements of overhead and underground supply and utilization equipment" should have served to alert plaintiff that it would need to account for placement of any overhead electrical utility equipment.

In addition, the December 18, 2015 RTOP and February 11, 2016 modification both provided instruction as to how plaintiff should perform the task order. The RTOP and modification both required performance of the task order "in accordance with the attached Performance Work Statement," i.e. the PWS, and, therefore, the PWS applied to the task order. The PWS provided, in section "2.2.8.3 Electrical," that "[a]ny existing electrical primary and secondary services, transformers (that need to be removed, or abandoned or required to be upgraded), electrical poles, light fixtures and any others that need to be removed or abandoned or relocated need to be identified." Importantly, as noted above, Appendix C to the PWS, contained a reference to "Ft Drum Utility Standards." Notably, among other records not provided to the court, this Appendix C was not included in the record before the court. Therefore, the court could not be confident when determining the requirements of the PWS with respect to the placement of electrical utilities.

The IDG, which, as outlined above, is referenced in the PWS, also provides detail with regard to relocation of electrical utilities, although plaintiff disputes the IDG's incorporation into the terms of the contract. Two provisions, however, demonstrate that the IDG was intended to be incorporated into the contract. The first, from the SOW section "C.10 Architectural," provided that "[a]rchitectural themes will be in accordance with Fort Drum's Installation Design Guide (IDG), latest edition." (emphasis added). The second, from a section of the PWS titled "2.2.3 Site/Civil Design," provided that "[t]he contractor shall provide and develop site design and landscaping for 400 project area, which comply with the Ft drum installation design guidelines requirements . . . ." (emphasis added). As discussed above, "[t]he Installation Design Guide" and the references to the "Ft drum installation design guidelines requirements" appear to refer to the same thing. Further, while the IDG is referenced in the context of "architectural themes" in the SOW, the reference in the PWS to "site design and landscaping," under the heading "Site/Civil Design," indicates that the IDG applies to the agreement between the parties. Considered together, the language of SOW section "C.10 Architectural" and the language of the PWS's "2.2.3 Site/Civil Design" section express the intent that the requirements of the IDG would be binding upon the parties. It, therefore, appears from the language of the contract documents, including the PWS, that the IDG's requirements were incorporated into the task order.

In the section "Purpose of the IDG" the IDG provides that "[t]he IDG includes standards and general guidelines for the design issues of site planning; architectural character, colors and materials; vehicular and pedestrian circulation; and landscape elements. This includes plant material, seating, signage, lighting, and utilities." (emphasis added). The IDG further provides in the "Audience" section that "[t]he IDG is to be used by all individuals involved in decision-making, design, construction, and maintenance of facilities," including "U.S. Army Corps of Engineers Project Managers, as well as Design and Construction staff." (emphasis added). The IDG section "Using the Design Guide" provides that "[t]he IDG applies to all projects, regardless of funding source." (emphasis added). The IDG's "Implementation" section of the IDG provides that the IDG's use should be required in "Request for Proposals on new projects, Scopes of Work for new projects, and maintenance agreements," and required an IDG Checklist[21] "to be completed by the design team to ensure that guidelines and standards have been considered in the design process." (emphasis added).

Provisions of the IDG regarding the placement of utilities are somewhat inconsistent and not totally clear. In general, the IDG, however, expresses a high degree of intention to have utilities placed underground. The IDG states "whenever possible place utilities underground." The IDG also names "[u]tilities are underground and are not visually obtrusive" as an asset, while "[o]verhead utilities are prominently visible" is listed as a liability. Further, the list of "Site Element Objectives" includes "[m]inimize negative visual impacts of all utility systems." Moreover, the "Utilities" section of the IDG provides:

---

[21] The IDG Checklist, required to be completed for all designs, asked: "Will all power and other distribution lines be located underground?"

"The visual and environmental impact of utilities should be minimized on the Installation. . . . Utilities shall be bored under roads unless otherwise directed." The parties both refer to a section of the IDG, "Utilities," which provides:

> Unsightly overhead utilities should be relocated underground wherever possible to reduce negative visual impacts, as well as to reduce maintenance and repair requirements. Underground utilities are also desirable for protection from terrorist or other enemy attack.
>
> . . .
>
> Power distribution lines should also be located underground to minimize negative visual impact, reduce maintenance, and protect from terrorist or other enemy attack. If overhead, they should be located out of view from main public visibility areas or screened to be as unobtrusive as possible.

Plaintiff argues that the IDG "is replete with language that is permissive – not mandatory – and does not impose any affirmative contractual obligation on BES." Plaintiff relies on the language "[u]nsightly overhead utilities should be relocated underground. . . . [a]nd [u]nderground utilities are also desirable . . . ." Although plaintiff is correct that the word "desirable," when considered alone, sounds permissive, plaintiff does not place the quoted language in the context of the "Utilities" section of the IDG, or address the IDG as a whole. In addition plaintiff does not address defendant's stated position that some of the utilities, although not necessarily all, should be placed underground. The language of the IDG, while perhaps inconsistent, does evince a strong desire on behalf of the government that electrical utilities be located underground whenever possible and that those utilities that cannot be underground should be hidden from view. On the other hand, the sentence in the IDG which states "[u]tilities shall be bored under roads unless otherwise directed" functions as a direction to the contractor to build the utilities underground, certainly under roads, unless otherwise directed by the government. This IDG language "shall be bored under roads" from the "Utilities" section of the IDG, with its provision for exceptions only as ordered, as well as the "should be relocated underground wherever possible" language, are consistent with defendant's statement that "from the start of performance, the contract required BESDB to place some electrical underground and to encase some parts in concrete." Further, to ignore the direction in the IDG that "[u]tilities shall be bored under roads unless otherwise directed," would "leave[] a portion of the contract useless, inexplicable, void, or superfluous." NVT Tech., Inc. v. United States, 370 F.3d at 1159. The phrase "shall be bored under roads" alone creates a requirement for plaintiff to place, at least, some electrical utilities underground, contrary to plaintiff's interpretation of the IDG as entirely permissive, not requiring that any utilities be placed underground and in ducts. Based on the record currently before the court, however, at this time, the court cannot come to a final determination about the requirements for requiring placement of electrical utilities underground throughout the project. As indicated above, the "Ft Drum Utility Standards," and the rest of Appendix C of the PWS, are missing from the record, which prevents the court from reaching a final resolution. In part, this is a result of the minimalist approach to briefing at times adopted

by the parties and the choices the parties made in providing appendices to their respective motions for partial summary judgment, which leaves the court without a complete picture of all the apparently relevant contract documents.

Even assuming for the sake of argument that the agreement between the parties did not require any underground placement of electric utilities, that would not end the court's analysis of the cross-motions for partial summary judgment. Plaintiff would also need to demonstrate the elements of a constructive change, including that an authorized government official ordered the change. "To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." Bell/Heery v. United States, 739 F.3d at 1335 (citing The Redland Co. v. United States, 97 Fed. Cl. 736, 755-56 (2011)). "If the government expressly or implicitly ordered work that was outside the scope of the contract, or if the government was at fault in causing work to be done outside the scope of the contract, a constructive change has occurred and plaintiff is entitled to an equitable adjustment of price." LB&B Assocs. Inc. v. United States, 91 Fed. Cl. 142, 153 (2010) (citing Lathan Co. v. United States, 20 Cl. Ct. 122, 128 (1990)). "Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract." Miller Elevator Co. v. United States, 30 Fed. Cl. at 678 (citation omitted). As the United States Court of Claims has stated:

> [W]e, . . . have held that, if a contracting officer compels the contractor to perform work not required under the terms of the contract, his order to perform, albeit oral, constitutes an authorized but unilateral change in the work called for by the contract and entitles the contractor to an equitable adjustment in accordance with the 'Changes' provision.

Len Co. & Assocs. v. United States, 181 Ct. Cl. 29, 38, 385 F.2d 438, 443 (1967) (footnote omitted); see also Chris Berg, Inc. v. United States, 197 Ct. Cl. 503, 525, 455 F.2d 1037, 1050 (1972) (finding that if the contractor was either actually or constructively ordered to paint certain surfaces beyond contract requirements, an equitable adjustment would be merited). Moreover, "[t]o prevail on a constructive change claim and secure an equitable adjustment, a contractor must show that an official with authority to bind the government demanded 'work above and beyond that in the contract.'" Ultimate Concrete, LLC v. United States, 141 Fed. Cl. 463, 475 (2019) (quoting Agility Def. & Gov't Servs. Inc. v. United States, 115 Fed. Cl. 247, 251 (2014)); see also Weston/Bean Joint Venture v. United States, 123 Fed. Cl. 341, 370 (2015), aff'd, 652 F. App'x 972 (Fed. Cir. 2016).

For damages for Count Two, plaintiff seeks six percent of the difference between the ECC stated in the contract, $4,500,000.00, and plaintiff's proposed, increased ECC included with plaintiff's 100% backcheck submission, $11,763,928.00,[22] in the amount of

---

[22] This is the ECC in the final 100% backcheck submission from plaintiff, submitted on September 29, 2017 in response to comments by the government on earlier 100% design submissions and 100% backcheck submissions.

$435,835.68. Starting with the submission of the 35% design on April 11, 2016, in which plaintiff included an "Underground Utilities Alternate" in its submission, and thereafter in the 65% submission on May 16, 2016, the 95% submission on July 6, 2016, the second 95% submission on September 8, 2016, the first 100% submission on October 19, 2016, the two additional 100% resubmissions on October 31, 2016, and December 12, 2016, as well as the 100% backcheck submission on January 23, 2017, and 100% backcheck resubmissions on July 21, 2017, September 19, 2017, and September 29, 2017, the plaintiff states it incorporated the underground electrical utilities requirement into its design submittals. Plaintiff did continue to perform on the contract as required by the Changes clause. See FAR 52.243-1(e). The Army paid plaintiff for each submission,[23] except for the 100% design submission, but claims it never approved the ECC increases proposed by the plaintiff.

As noted above, in order to establish entitlement on a theory of constructive change, plaintiff must show "that the additional work was ordered, expressly or impliedly, by the government." Bell/Heery v. United States, 739 F.3d at 1335. Moreover, "an official with authority to bind the government" must have issued the order. See Ultimate Concrete, LLC v. United States, 141 Fed. Cl. at 475. The contract between plaintiff and the government provides that

> [o]nly a Warranted Contracting Officer, acting within their delegated limits, has the authority to make modifications or otherwise change the terms and conditions of this contract. If an individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract [the contractor] shall not proceed with the change and shall immediately notify the Contracting Officer.

The contract also provided and emphasized:

> IMPORTANT NOTICE: *The Contractor will not accept any instructions issued by any person other than the Contracting Officer or his/her authorized representative acting within the limits of his/her authority. No information other than that which may be contained in any authorized amendment to this contract or any authorized modification to the contract issued by the Contracting Officer, which may be received from any person employed by the U.S. Government or otherwise, shall be considered as grounds for deviation from any provisions, conditions or other terms of this contract.*
>
> . . .

---

[23] While the Army at first made only a partial payment for the 95% design submission, the Army eventually paid the balance due on the 95% design submission following issuance of the Contracting Officer's Final Decision.

C.15.5 Government Contracting Officers Representatives Their Authority: The Contracting Officer may identify the individuals to act as the Contracting Officer's Representative (COR) and the Alternate Contracting Officer's Representative (ACOR). This designation will be made in writing with a copy furnished to the contractor. The COR staff will represent the Contracting Officer in the administration of the contract, but will not be authorized to change any of the terms and conditions of the contract.

> No oral statements of any person, whomsoever, will, in any manner or degree, modify or otherwise affect the terms and conditions of this contract. The Contracting Officer shall be the ONLY person authorized to approve changes in any provisions contained elsewhere in this contract, and said authority shall remain solely with the Contracting Officer.

(italics and capitalization in original). These provisions of the contract demonstrate that only a contracting officer can change the terms and conditions of the contract.

Plaintiff argues that the government for the first time directed BES to redesign existing electrical utilities underground at the Design Charrette meeting. According to plaintiff, at the Design Charrette meeting and in its various percentage design submissions, most of which were paid fully by the government, the government acted in ways that were the equivalent of approving the increased ECC numbers. The record currently before the court, however, is not clear whether these actions by the government equate to approval or ratification by the government of a change to the contract, which would lead to a compensable change.

In attendance at the Design Charrette meeting were several representatives of plaintiff and defendant. On behalf of defendant, Mr. Stone, Acting Chief of Engineering at Fort Drum, as well as the Contracting Officer at the time, Ms. McAleese, were present. Ms. McAleese as the Contracting Officer had authority to bind the government and to authorize a change to the contract. Plaintiff argues that because Ms. McAleese was present at the Design Charrette meeting, and because she did not object to plaintiff's identification of placing the utilities underground as a change to the contract, she implicitly approved the underground utility requirement as a change. Whether or not that occurred is not definitely resolved in the record currently before the court, or satisfactorily addressed by the parties' cross-motions. Similarly, although the deposition testimony of Mr. Stone suggested that one 100% final design was accepted by someone on behalf of the government, Mr. Stone could not identify the individual who did so and that issue remains unresolved as to its accuracy.

Further, defendant argues that even if the Army's requirement that electrical utilities be placed underground might have been in the nature of a constructive change, plaintiff's claim could still fail if plaintiff did not meet the contract requirements to provide prompt, written, and specific notice to the Army of any alleged changes. Whether the ECC changes met those requirements and what happened when each percentage submission

was received remains unresolved. In addition, it appears from the record currently before the court that plaintiff may have been encouraged to submit an REA, which although ultimately rejected, creates an open issue of fact as to whether the communications on that subject acknowledged a proper change.

Plaintiff also urges that this court should not require "strict compliance" with the terms of the contract, which requires written, specific notice to the government of alleged changes. Plaintiff argues that "[w]here responsible Government officials are aware or should be aware of the facts giving rise to a claim, strict compliance with a contract's written notice requirements is not required. . . . In fact, oral notice to responsible Government representatives is sufficient." (internal citations omitted).

The contract, as discussed above, incorporated FAR 52.236-22, Design Within Funding Limitations (Apr 1984)," which provides that "[t]he Contractor will promptly advise the Contracting Officer if it finds that the project being designed will exceed or is likely to exceed the funding limitations and it is unable to design a usable facility within these limitations." FAR 52.236-22(b). The contract additionally incorporated by reference FAR 52.243-7, "Notification of Changes (1984)," which provides in relevant part:

(b) *Notice.* The primary purpose of this clause is to obtain prompt reporting of Government conduct that the Contractor considers to constitute a change to this contract. Except for changes identified as such in writing and signed by the Contracting Officer, the Contractor shall notify the Administrative Contracting Officer in writing promptly, within __ (*to be negotiated*) calendar days from the date that the Contractor identifies any Government conduct (including actions, inactions, and written or oral communications) that the Contractor regards as a change to the contract terms and conditions. On the basis of the most accurate information available to the Contractor, the notice shall state –

(1) The date, nature, and circumstances of the conduct regarded as a change;

(2) The name, function, and activity of each Government individual and Contractor official or employee involved in or knowledgeable about such conduct;

(3) The identification of any documents and the substance of any oral communication involved in such conduct;

(4) In the instance of alleged acceleration of scheduled performance or delivery, the basis upon which it arose;

(5) The particular elements of contract performance for which the Contractor may seek an equitable adjustment under this clause, including –

(i) What contract line items have been or may be affected by the alleged change;

(ii) What labor or materials or both have been or may be added, deleted, or wasted by the alleged change;

(iii) To the extent practicable, what delay and disruption in the manner and sequence of performance and effect on continued performance have been or may be caused by the alleged change;

(iv) What adjustments to contract price, delivery schedule, and other provisions affected by the alleged change are estimated; and

(6) The Contractor's estimate of the time by which the Government must respond to the Contractor's notice to minimize cost, delay or disruption of performance.

(c) *Continued performance*. Following submission of the notice required by (b) above, the Contractor shall diligently continue performance of this contract to the maximum extent possible in accordance with its terms and conditions as construed by the Contractor, unless the notice reports a direction of the Contracting Officer or a communication from a SAR [Specifically Authorized Representative] of the Contracting Officer, in either of which events the Contractor shall continue performance; *provided*, however, that if the Contractor regards the direction or communication as a change described in (b) above, notice shall be given in the manner provided. All directions, communications, interpretations, orders and similar actions of the SAR shall be reduced to writing promptly and copies furnished to the Contractor and to the Contracting Officer. The Contracting Officer shall promptly countermand any action which exceeds the authority of the SAR.

(d) *Government response*. The Contracting Officer shall promptly, within __ (*to be negotiated*) calendar days after receipt of notice, respond to the notice in writing. In responding, the Contracting Officer shall either –

(1) Confirm that the conduct of which the Contractor gave notice constitutes a change and when necessary direct the mode of further performance;

(2) Countermand any communication regarded as a change;

(3) Deny that the conduct of which the Contractor gave notice constitutes a change and when necessary direct the mode of further performance; or

(4) In the event the Contractor's notice information is inadequate to make a decision under (1), (2), or (3) above, advise the Contractor what additional information is required, and establish the date by which it should be furnished and the date thereafter by which the Government will respond.

(e) *Equitable adjustments.* (1) If the Contracting Officer confirms that Government conduct effected a change as alleged by the Contractor, and the conduct causes an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether changed or not changed by such conduct, an equitable adjustment shall be made –

(i) In the contract price or delivery schedule or both; and

(ii) In such other provisions of the contract as may be affected.

(2) The contract shall be modified in writing accordingly. In the case of drawings, designs or specifications which are defective and for which the Government is responsible, the equitable adjustment shall include the cost and time extension for delay reasonably incurred by the Contractor in attempting to comply with the defective drawings, designs or specifications before the Contractor identified, or reasonably should have identified, such defect. When the cost of property made obsolete or excess as a result of a change confirmed by the Contracting Officer under this clause is included in the equitable adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of the property. The equitable adjustment shall not include increased costs or time extensions for delay resulting from the Contractor's failure to provide notice or to continue performance as provided, respectively, in (b) and (c) above.

FAR 52.243-7 (emphasis added; italics and capitalization in original).

The contract contains two FAR clauses requiring written notice to the Contracting Officer of the specifics of an alleged change as articulated in the applicable regulations with FAR 52.236-22 and FAR 52.243-7. At issue, therefore, is whether the notice at the Design Charrette meeting or the inclusion in the 35%, 65%, 95%, and multiple 100% submissions of a revised ECC can qualify as "prompt written notice" to the government of a change to the contract.

The Court of Appeals for the Federal Circuit has indicated, "[s]ometimes, extenuating circumstances have weighed against strict enforcement" of notice provision requirements such as limits on the amount of time within which a contractor must bring a change to the attention of the government. See K-Con Bldg. Sys., Inc. v United States, 778 F.3d 1000, 1010 (Fed. Cir. 2015). In K-Con Building Systems, Inc. v. United States, the Federal Circuit referenced Hoel-Steffen Construction Co. v. United States, a case in the United States Court of Claims, a predecessor court to the Federal Circuit, in support of excusing failure to strictly comply with notice requirements, explaining

> "a severe and narrow application of the notice requirements [of the suspension clause in the then-extant Federal Procurement Regulations] . . . would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the Government is quite aware of the operative facts . . . ."

K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1010 (quoting Hoel-Steffen Constr. Co. v. United States, 197 Ct. Cl. 561, 573 (1972)) (alterations in original); see also Lake Charles XXV, LLC v. United States, 118 Fed. Cl. 717, 721 (2014). As for K-Con Building Systems, Inc., the clause at issue required the contractor to give notice to the contracting officer of any order that the contractor considered a change, with the notice consisting of "(1) [t]he date, circumstances, and source of the order" and "(2) [t]hat the Contractor regards the order as a change order," with such notice required to be given within 20 days of the alleged change. See FAR 52.243-4(b), (d). In K-Con Building Systems, Inc., the Federal Circuit determined that the contractor could not be excused for failing to comply with the time-limit provision of FAR 52.243-4(d) because the contractor "proffered no evidence suggesting the Coast Guard knew or should have known that K-Con considered the work requests to be contract changes," until a letter was sent a year after the alleged changes had occurred, which "lack[ed] any detail with regard to what [the contractor] considered to be the changes made . . . ." K-Con Bldg. Sys., Inc. v United States, 778 F.3d at 1010.

In the case currently before the court, plaintiff argues that it had made the Army aware of a change regarding the requirement to place utilities underground as early as the Design Charrette meeting and then in writing in the submissions of the 35% design, which stated in writing that the "Underground Utilities Alternate," plaintiff's apparent chosen name for the underground electrical utilities requirement in the 35% design, would raise the ECC, the cost of construction, to $4,878,214.00. Each subsequent percentage submission stated an ECC greater than the Army's ECC and that a large portion of each design's ECC would be attributable to the "electrical division"[24] of the construction cost. With the 65% submission, the proposed total ECC was $5,744,127.00, with an electrical division cost of $2,809,553.00. For the 95% submission, the included, proposed ECC was $5,187,513.00, with an electrical division of $1,902,679.00. The 100% submission

---

[24] The phrase "electrical division" is not explained in plaintiff's cost spreadsheets included with each percentage submission.

included a proposed ECC was $11,821,977.00, with an electrical division of $5,375,794.00. In January 2017, the proposed ECC of plaintiff's 100% design submission was $5,187,513.00. This amount is consistent with plaintiff's ECC at the 35% submission in April 2016, the submission most immediately following the Design Charrette meeting, at which according to plaintiff that the Army first stated its requirement for the installation of underground electrical utilities. Beginning July 21, 2017, with the fourth version of the 100% design, plaintiff's proposed ECC, however, increased substantially, to over $11,000,000.00, at which level plaintiff's proposed ECC remained when the contract was terminated on June 26, 2019.

Therefore, plaintiff relies on the various percentage submissions as meeting notice requirements with inclusion of the proposed increased ECCs serving to make the government "aware of the operative facts." Defendant argues, however, that plaintiff has not conformed with the notice requirements in the contract, including the notice provisions in FAR 52.236-22 and FAR 52.243-7. With the exception of the final 100% submission, however, defendant did pay plaintiff for the work done in response to each submission. In general, the communications between the parties on this and other issues during contract performance remain unclear based on the parties' submissions to the court to date. Moreover, in its submissions to the court, defendant does not address this allegation by plaintiff in a meaningful way and thus the issue remains unresolved.

Finally, defendant argues that plaintiff cannot recover even if plaintiff were to be ultimately successful regarding the existence of a change, because plaintiff has failed to provide sufficient cost data to support its submitted REA and for its certified claim. Plaintiff's REA provided that "[t]his equitable adjustment is requested due to the additional professional liability risk in the amount of $7.3M and the extensive additional design requirements and betterment that FT Drum received on this project." Plaintiff included a chart in the REA with an estimated cost of construction broken down into divisions such as "General Requirements," "Plumbing," and "Electrical," for five selected percentage submissions: 35% (April 11, 2017) [sic], 65% (June 20, 2016), 95% (July 6, 2016), 100% (December 31, 2016), and 100% backcheck (September 29, 2017). Plaintiff argues in response that "BES provided its costs data to the Government on numerous occasions in support of its request for compensation. In both the REA and the Certified Claim, BES submitted actual cost data Government [sic]." Plaintiff also claims to have provided "a spreadsheet documenting the increased costs incurred as a result of the increased design work" in response to a request for supplemental information from the Contracting Officer, as well as "timesheets verifying actual hours worked as well as invoices." Plaintiff's appendix submitted to this court includes a spreadsheet of "Direct Costs," dated December 5, 2017, with rates for various project positions such as "Principal-in-charge," "Project Manager," and "Sr. Project Architech [sic]," as well as a "Direct Total" of $102,151.30, although it is unclear whether this spreadsheet only documents costs attributable to the alleged change. Plaintiff's appendix also includes a spreadsheet labeled "BESBD 400 Arears Timesheets," also dated December 5, 2017, and numerous invoices dated between April 7, 2016 and January 10, 2017, although it is also unclear whether these timesheets and invoices account solely for work attributable to the alleged change. These documents appear in the record as attachments to an email dated

December 5, 2017 from plaintiff's Managing Partner, Mr. Banach, to Marisa Mustizer, Division Chief of Installation Support at Fort Drum. The information provided by plaintiff in support of its REA and its certified claim did not identify the costs attributable to the Army's alleged change to the contract requirements. The PWS indicates that plaintiff was required to place at least some of the electrical utilities underground, although it remains unclear which utilities were required to be placed underground. Furthermore, the issue of the sufficiency of the cost data was not joined to a detailed enough way in the parties' submissions.

The parties have very disparate views of the contract requirements and what happened during contract performance. After painstaking analysis of the parties' multiple filings with the court, including the selected appendices they filed, although the court notes that the plaintiff may have a difficult path forward to prevail on Count Two of the third amended complaint, there remain unresolved issues of material fact. For facilitation of further proceedings in this case, the court has carefully laid out the relevant parts of the contractual documents and applicable established facts, as well as discussed material facts which remain in dispute. Thus far, plaintiff has argued that "the language of the Task Order plainly and unambiguously does <u>not</u> require underground electrical utilities." (emphasis in original). According to plaintiff, therefore, none of the utilities were required to be placed underground or encased in concrete. Throughout the debate in the case the plaintiff has insisted that under the terms of the agreement between the parties, placement of all the utilities underground was not within the terms of that agreement. Defendant, however, consistent with the IDG, asserts that "from the start of performance, the contract documents required BESDB to place some electrical underground and to encase some parts in concrete." The defendant does not appear to argue that all electrical utilities needed to be underground and encased. At this time, defendant has not indicated if the contract documents further defined which of the electrical utilities need to be placed underground, what percentage, or how the contract documents referenced how to determine the various placements. As such, there are unresolved questions of fact regarding the placement of the utilities. Additionally, plaintiff makes allegations of fact regarding the role the contracting officers in the case played during contract performance. The court also notes that there are references in the record to appendices which appear to have relevance to the issue of electrical utility placement that were not submitted to the court, such as Appendix C to the PWS, which states it includes "Ft Drum Utility Standards." This raises concerns for the court as to whether relevant information is contained in these documents which could resolve certain of the outstanding issues. All the above referenced remaining issues of fact remain to be resolved.

# C O N C L U S I O N

For the reasons stated above, the defendant's motion for partial summary judgment on Count Two of plaintiff's third amended complaint is **DENIED**. Plaintiff's cross-motion for partial summary judgment is also **DENIED**. Further proceedings will be scheduled in a separate Order.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**